UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---X

ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE NORTHBROOK INDEMNITY COMPANY,

Plaintiffs,

-against-

ANTHONY PALMIERI, TITAN DIAGNOSTIC IMAGING SERVICES, INC., AND JOHN DOE DEFENDANTS "1" THROUGH "10",

Defendants.

---X

Docket No.: 26-cv-6440

**COMPLAINT**

**Plaintiffs Demand a Trial by Jury**

## COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company (collectively, "Allstate" and/or "Plaintiffs"), by their attorneys, the Law Offices of Camille Nanni, as and for their Complaint against Defendants Anthony Palmieri ("Palmieri"), Titan Diagnostic Imaging Services, Inc. ("Titan"), and John Doe Defendants "1" - "10" ("John Doe Defendants") (all collectively, referred to hereinafter as the "Defendants"), allege as follows:

## NATURE OF THE ACTION

1. Allstate initiates this action to terminate a large-scale healthcare fraud scheme perpetrated by the Defendants, who conspired together in a common scheme to exploit patients and defraud New York No-Fault insurers (hereinafter, referred to as the "Fraudulent Scheme"). To effectuate this scheme, the Defendants submitted bills for medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, styled as diagnostic ultrasounds (hereinafter,

"Ultrasound"), videonystagmus tests (hereinafter, "Vestibular"), and transcranial doppler and duplex doppler scans (hereinafter, "Doppler") (collectively, the "Fraudulent Services"). These Fraudulent Services were rendered, to the extent rendered at all, by unlicensed laypeople without supervision, in direct violation of New York and federal law.

2. Palmieri is not a licensed healthcare provider, and Titan is not a professional corporation. Despite not being licensed to perform any kind of medical services on patients, Titan submitted in excess of $1,303,968.73 in billing for medical diagnostic testing. This billing was accompanied by falsified medical records to create the illusion that the tests were medically indicated, pursuant to legitimate referrals by treating healthcare professionals, administered and supervised by licensed individuals, and interpreted by medical professionals. In fact, the services were virtually never rendered pursuant to any legitimate referral, and were administered, to the extent administered at all, by unlicensed and unsupervised individuals pursuant to pre-determined protocols designed by laypersons to maximize profits.

3. The scheme was masterminded by Palmieri, an unlicensed layperson, who along with unidentified and unlicensed co-conspirators (the "John Doe Defendants") designed the Fraudulent Scheme to circumvent New York law and defraud New York No-Fault insurers. The nature of the healthcare fraud scheme described herein is all too common in New York and has plagued the No-Fault system.

4. To effectuate the Fraudulent Scheme, Palmieri established a non-professional entity, Titan, to be used as a vehicle to submit claims to Allstate for healthcare services ostensibly rendered to Allstate-insured patients, hereinafter, ("Insureds"), injured in motor vehicle accidents.

5. To secure a patient base whose insurance benefits could be used to bill insurers, the Defendants arranged for Titan to purport to operate at over fifty-nine (59) multidisciplinary clinics

that almost exclusively treat No-Fault patients (hereinafter, "Clinics"), located throughout the New York City Metropolitan Area. Integral to the success of the Fraudulent Scheme, the Defendants entered into illegal, collusive arrangements with unlicensed laypersons who controlled the clinics ("Clinic Controllers"). Through these illicit arrangements, the Clinic Controllers and the Defendants predetermined which healthcare services would be rendered to patients and when those services would be provided.

6. The Defendants billed Allstate for the technical component of Ultrasounds, Vestibular and Doppler tests. The services billed were medically unnecessary, illusory, unlawfully rendered, and charged to Allstate using Current Procedure Terminology ("CPT") codes and fees that grossly misrepresented the services that were provided.

7. Through the U.S. Mail, the Defendants submitted, or caused to be submitted to Allstate, fraudulent billing amounting to over $1,303,968.73 for the Fraudulent Services ostensibly rendered to Allstate Insureds.

8. As a result of the fraudulent claim submissions, Allstate wrongfully paid $179,689.87 to Titan for illusory, medically unnecessary, and otherwise non-reimbursable healthcare services.

9. Palmieri, Titan, and the John Doe Defendants joined together in a purposeful and organized manner, with everyone fulfilling a specific and necessary role to facilitate this extensive healthcare fraud scheme. In a period of months, Titan transitioned from minimal billing with Allstate to a high revenue billing operation, operating in at least fifty-nine (59) offices across the New York City Metropolitan Area.

10. At all relevant times discussed herein:

(i) The Defendants engaged in the unlicensed practice of medicine by performing, directing, and billing for healthcare services, despite the absence of virtually any legitimate medical referrals;

(ii) The Defendants engaged in the unlawful practice of radiologic technology by performing, directing, and billing for Ultrasounds and Doppler, despite not being licensed in New York as radiologic technologists and also not being physicians, dentists, podiatrists, or chiropractors;

(iii) At all relevant times, Titan lacked the required legal and regulatory authority to bill for professional medical services and receive No-Fault reimbursement because it was not a medical Professional Corporation and was not registered with the New York State Education Department, Office of the Professions;

(iv) The Defendants intentionally and knowingly schemed to, and did, subject Insureds to medically unnecessary and unproven service(s) designed for no other purpose than to defraud Allstate and other insurers;

(v) The Defendants misrepresented and exaggerated the level and types of services purportedly provided, using billing codes that would inflate the charges submitted to Allstate; and

11. As such, the Defendants do not have, nor have they ever had, any right to be compensated for the Fraudulent Services that were billed to Allstate through Titan.

12. Through the U.S. Mail, the Defendants submitted, or caused to be submitted, to Allstate in excess of 9,000 fraudulent claims.

13. The Fraudulent Scheme continues uninterrupted through the present day, as the Defendants continue to seek payment of the pending charges for the Fraudulent Services.

14. The chart annexed as Exhibit 1 sets forth a representative sample of the fraudulent charges that the Defendants submitted, or caused to be submitted, to Allstate through Titan.

15. The chart annexed as Exhibit 1 further sets forth the dates of Defendants' use of the U.S. Mail in furtherance of the Fraudulent Scheme in violation of 18 U.S.C. § 1341.

16. Allstate brings this action pursuant to:

i. The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and (d), and 1964(c);

ii. New York State common law claims of fraud and unjust enrichment; and

iii. The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

17. This action seeks actual damages currently in excess of $179,689.87, the exact amount to be determined at trial, representing insurance payments that were wrongfully obtained from Allstate by, or on behalf of, Titan, as a direct result of the Defendants' unlawful conduct and material misrepresentations.

18. Allstate also seeks a declaration pursuant to 28 U.S.C. §§ 2201-2202, that it is not legally obligated to pay or reimburse Titan (or its agents) in connection with any past claims, currently amounting to in excess of $1,124,278.86, the exact amount to be determined at trial, or any future claims seeking payment under New York's No-Fault laws.

## THE PARTIES

### I. Plaintiffs

19. Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

20. Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company each have their principal place of business in Northbrook, Illinois.

21. At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company were each authorized to conduct business in New York.

## II. Defendants

22. Defendant Palmieri resides in and is a citizen of New Jersey. Palmieri serves as the sole record owner of Titan.

23. Palmieri is not licensed in New York as a healthcare professional.

24. Defendant Titan is a New York corporation that was incorporated on or about November 14, 2019, with its principal place of business in New York.

25. Titan is not a medical professional corporation nor was it registered with the New York State Education Department, Office of the Professions, as required for corporations performing medical services.

26. Since on or about May 2023, Titan has been used by Palmieri and the John Doe Defendants to submit fraudulent billing to Allstate and other insurers.

27. The John Doe Defendants are individuals and/or entities whose identities are not presently known to Allstate. Upon information and belief, they reside in, are domiciled in, and are citizens of New York. The John Doe Defendants are unlicensed individuals who participated in the Fraudulent Scheme perpetrated against Allstate by, among other things, participating in, assisting with, and/or facilitating the operation and control of Titan; establishing the illegal collusive arrangements with Clinic Controllers, and/or spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care; and creating medical documentation relied on by Titan to implement the Fraudulent Scheme.

## JURISDICTION AND VENUE

28. 28 U.S.C. § 1331 grants this Court jurisdiction over claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §§ 1961 et seq., because they arise under the laws of the United States.

29. 28 U.S.C. § 1332(a)(1) confers subject matter jurisdiction upon this Court because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is a matter between citizens of different states.

30. This Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

31. Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367, and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary Defendant.

32. Furthermore, 28 U.S.C. § 1391 allows venue in this District to be appropriate, as the Eastern District of New York is the district where one or more of the Defendants reside and because this is the district in which a substantial part of the events giving rise to Allstate's claims against the Defendants occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

33. Allstate underwrites automobile insurance in the State of New York.

### I. Applicable Laws and Regulations

#### A. New York Laws Pertaining to Medical Licensing

34. The State of New York regulates the practice of medicine and restricts it and the ownership of medical professional corporations to licensed physicians. The State does so to protect consumers and public health. Only licensed physicians, subject to the regulation and oversight of the State, are permitted to practice medicine.

35. The practice of medicine is defined to include "diagnosing, treating, operating, or prescribing for any human disease, pain, injury, deformity or physical condition." See New York Education Law § 6521.

36. Pursuant to New York Education Law §§ 6511, 6512 and New York Penal Law § 20.00, the practice of medicine by one who is not a physician, and the aiding or abetting of same, are felonies.

37. It is professional misconduct for a physician to permit, aid or abet an unlicensed person to perform the activities of a physician. See New York Education Law § 6530(11). It is also professional misconduct to permit laypersons to share in the fees for professional medical services. See New York Education Law § 6530(19).

38. Under New York Education Law Title 8, the authority to practice any licensed profession is expressly limited to individuals who are "licensed or otherwise authorized" to do so, and no person may lawfully practice or offer to practice a profession without such authorization. New York Education Law § 6512 further makes it a felony for "anyone not authorized to practice under this title" to practice, offer to practice, or hold themselves out as able to practice a licensed profession, and also criminalizes aiding or abetting unlicensed practice.

39. Consistent with these statutory restrictions, the New York State Education Department's Office of the Professions provides that "professional services can only be offered by licensed professionals or authorized professional organizations," thereby prohibiting unlicensed individuals and general business corporations from offering professional services in New York.

40. Pursuant to the New York State Rules of the Board of Regents, it is unprofessional conduct to delegate professional responsibilities to a person who is not qualified to perform them and to fail to exercise appropriate supervision over persons who are authorized to practice only under the supervision of a licensed professional. See NYS Rules of the Board of Regents §§ 29.1(10), 29.2(5). Moreover, it is unprofessional conduct to order excessive tests and treatment not warranted by the condition of the patient. See NYS Rules of the Board of Regents § 29.2(7).

41. This statutory framework is designed to protect the public and to ensure that medical and other professional services are provided appropriately and only by licensed individuals.

**B. New York Laws Prohibiting the Unauthorized Practice of Radiologic Technology**

42. The Public Health Law governs the practice of Radiologic Technology in New York. See New York Public Health Law §§ 3500, 3501:

i. "Radiologic technology" is defined by the Public Health Law to include the practice of radiography. See New York Public Health Law § 3501(1).

ii. "Radiography" is defined by the Public Health Law to include the use of x-ray or x-ray producing equipment. See New York Public Health Law § 3501(3).

iii. "X-ray" is defined by the Public Health Law to include conventional diagnostic x-ray or radiology, computer tomography, angiography, magnetic resonance imaging, and ultrasound. See New York Public Health Law § 3501(15).

43. Section 3502 of the Public Health Law requires that "only persons licensed under this article shall practice radiography, radiation therapy or nuclear medicine technology or use the title 'radiographer,' 'radiologic technologist,' 'radiation therapist' or 'nuclear medicine technologist' or use the abbreviations LRT, RTT, LRTT, NMT, or LNMT with his or her name…" See e.g., New York Public Health Law §§ 3502(2)(c).

44. The Public Health Law prohibits (i) aiding and abetting in the practice of radiologic technology a person who is not a registered radiologic technologist or who is practicing a form of radiologic technology which is beyond the scope of the individual's license; (ii) engaging in any practice beyond the scope of the practice of radiologic technology or beyond the scope of the individual's license as defined in this article; and (iii) falsely impersonating a duly registered

radiologic technologist or former duly registered radiologic technologist, or is practicing radiologic technology under an assumed name. See New York Public Health Law § 3510(1).

**C. New York Prohibitions Against Improper Referrals**

45. The New York Public Health Law and its corresponding regulations promulgated by the Department of Health prohibit a practitioner from ordering enumerated services, including pharmacy, imaging, and physical therapy services, when the referring provider has a financial relationship with the provider performing the service. See e.g., New York Public Health Law § 238-A (1)(a) and 10 N.Y.C.R.R. § 34-1.3.

46. The same laws and regulations prohibit referrals for any other "health or health related items" where a financial relationship exists unless the financial relationship is disclosed to the patient and the patient is informed of their right to use alternative healthcare providers for the services. See e.g., New York Public Health Law § 238-D and 10 NYCRR § 34-1.5.

**D. New York's Laws Pertaining to No-Fault Reimbursement**

**i. New York's No-Fault Insurance System**

47. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), (collectively, "the No-Fault laws"), automobile insurers such as Allstate are required to pay first-party benefits to reimburse for basic economic loss ("No-Fault Benefits"), sustained by an eligible injured person on account of personal injuries caused by an accident arising out of the use or operation of a motor vehicle.

48. Basic economic loss is defined to include necessary expenses of medical and healthcare services up to $50,000 per person.

49. Whether a particular service rendered, or product purchased, is a covered expense eligible for reimbursement under No-Fault is governed by New York Insurance Law § 5102(a)(1), as follows:

> All necessary expenses incurred for (i) medical, hospital (including services rendered in compliance with article forty-one of the public health law, whether or not such services are rendered directly by a hospital), surgical, nursing, dental, ambulance, x-ray, prescription drug and prosthetic services; (ii) psychiatric, physical and occupational therapy and rehabilitation; (iii) and non-medical remedial care and treatment rendered in accordance with a religious method of healing recognized by the laws of this state; and (iv) any other professional health services…

See New York Insurance Law § 5102(a)(1).

50. New York Insurance Law § 5102(a)(1) is implemented under Regulation 68, 11 NYCRR 65-3.16(a)(6), which provides, in pertinent part:

> (6) The term " any other professional health services," as used in section 5102(a)(1)(iv) of the Insurance Law, this Part and approved endorsements, shall be limited to those services that are required or would be required to be licensed by the State of New York if performed within the State of New York. Such professional health services should be necessary for the treatment of the injuries sustained and within the lawful scope of the licensee's practice…

See 11 NYCRR 65-3.16(a)(6).

51. An Insured may assign their rights to No-Fault Benefits to providers of healthcare services in exchange for those services.

52. Following a duly executed assignment, a healthcare provider may submit claims directly to the insurance company using the claim form entitled "Verification of Treatment by Attending Physician or Other Provider of Health services," ("NF-3 Claim Form"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration Insurance Claim form ("HCFA-1500 Form").

53. The No-Fault laws provide that insurers pay claims for medical services directly to the healthcare provider promptly and in accordance with established fee schedules governed by the New York Workers' Compensation Fee Schedule ("Fee Schedule").

54. The Fee Schedule adopts the AMA Current Procedural Terminology Book reporting rules which, in turn, instruct the use of the AMA CPT Assistant ("CPT Assistant") to verify the intent of a CPT code when reporting services.

55. When a healthcare provider submits a claim for No-Fault Benefits using the CPT codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that was used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that was used was reasonable and medically necessary; and (iii) the service and the attendant fees were not excessive.

56. Pursuant to New York Insurance Law § 403, the NF-3 Claim Forms submitted by a healthcare provider to Allstate, and to all other automobile insurers, must be verified by the healthcare provider, subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other persons files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading information concerning any fact material thereto, commits a fraudulent insurance act which is a crime.

57. Similarly, all HCFA-1500 forms submitted by a healthcare services provider to Allstate, and to all other automobile insurers, must be verified by the healthcare services provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete, or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

### ii. Services Rendered in Violation of the Business Corporation Law, Licensing Laws, and the Public Health Law are Not Reimbursable Under the No-Fault Laws

58. The No-Fault laws expressly provide that a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet *any* applicable New York State or local licensing requirements necessary to perform such services in New York. See 11 N.Y.C.R.R. § 65-3.16 (a)(12) (emphasis added).

59. In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, MD, PC v. Progressive Ins. Co., 33 N.Y.3d 389, 406 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York, because of the concern that unlicensed individuals are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

60. In Fair Price Med. Supply Corp. v. ELRAC Inc., 12 Misc. 3d 119, 820 N.Y.S.2d 679 (App. Term, 2d & 11th Jud. Dists. 2006) the New York Appellate Term, Second Department interpreted that the Public Health Law is subject to 11 NYCRR § 65-3.16(a)(12) and is therefore a complete defense to non-payment of a No-Fault claim. Such a defense is not precluded even if it is not stated in a timely denial.

61. Accordingly, under the No-Fault laws, an individual or entity is not eligible to receive No-Fault Benefits if it is not professionally licensed, if it permits unlicensed laypersons to control or dictate medical treatment, engages in the unlicensed practice of a profession, makes or receives a referral in violation of the law and/or fails to abide by any other state or local licensing requirement.

**E. Laws Pertaining to Racketeer Influenced and Corrupt Organizations ("RICO")**

62. The Organized Crime Control Act of 1970 was established in order to prevent and punish racketeering activity. See 18 U.S.C. § 1962.

63. Under 18 U.S.C. § 1962(c)-(d):

> (c) it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
> (d) It shall be unlawful for any person to conspire to violate any provisions of subsection (a), (b), or (c) of this section.

64. An "enterprise," under 18 U.S.C. § 1961(4), "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]"

Under 18 U.S.C. § 1964 (a) Civil Remedies:

> The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

65. In addition to providing a mechanism to counter criminal activities, the RICO statute also establishes and provides for a private enforcement scheme for violations of the RICO statute.

66. 18 U.S.C § 1964(c) states:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

67. "Racketeering activity" is defined in 18 U.S.C. § 1961 and includes any act which is indictable under 18 U.S.C. § 1341 (relating to mail fraud).

68. An individual or entity commits mail fraud when they:

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money…by means of false or fraudulent pretenses, representations, or promises…for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing.

## II. The Defendants' Fraudulent Scheme

69. Beginning in May 2023 and continuing through the present day, the Defendants implemented a complex scheme in which Titan, a non-professional corporation owned by Palmieri, who is not a licensed healthcare provider, was used to fraudulently bill Allstate and other New York automobile insurers hundreds of thousands of dollars for healthcare services that were unnecessary, excessive, illusory, and/or otherwise non-reimbursable.

### A. Palmieri's Prior Criminal Conviction and Related Civil Fraud Allegations Evidence a Pattern of Healthcare Fraud

70. Palmieri's documented associations with prior healthcare fraud schemes made him an optimal participant for the Fraudulent Scheme.

71. On June 25, 2018, in the United States District Court for the Southern District of New York, Palmieri was charged with conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1349 and 1347, and aiding and abetting, in violation of 18 U.S.C. § 2.

72. Thereafter, on February 5, 2019, Palmieri pleaded guilty to the conspiracy count, admitting his participation in a multi-year scheme to defraud Medicare through the submission of

false claims for services purportedly provided by Veritas Imaging, Inc., a company he allegedly owned.

73. Palmieri was sentenced to six months' imprisonment and ordered to pay more than $195,000 in restitution to Medicare. See United States v. Palmieri, No. 18-CR-897 (S.D.N.Y. 2019).

74. Similarly, New York No-Fault insurer Government Employees Insurance Company ("GEICO") brought an action against Palmieri and Titan describing a fundamentally similar, if not identical, healthcare fraud scheme as the one described herein.[1]

75. GEICO alleged that Palmieri and Titan were engaged in and facilitated the unauthorized practice of medicine, and that Palmieri, Titan, and other defendants used sham diagnostic testing, illegal referrals, and non-medical billing practices to extract millions of dollars from GEICO and other insurers. The billing, for services including doppler, ultrasounds and vestibular studies, was medically unnecessary, illusory, or not actually performed, or otherwise non-reimbursable under New York's No-Fault Law.

76. Palmieri's prior alleged involvement in substantially similar conduct further demonstrates that he acted knowingly and intentionally.

### B. Palmieri and Titan Engaged in the Unauthorized Practice of Medicine

77. New York State controls the practice of medicine by limiting both medical services and the ownership of professional medical corporations to individuals who are licensed physicians. This framework is designed to safeguard patients and promote public health. Accordingly, only physicians who are licensed and subject to state regulation and oversight are authorized to practice medicine.

[1] Gov't Emples. Co. et al., v. Palmieri, et al. 24-cv-02182-BMC (E.D.N.Y.); Dkt., 1.

78. The New York State Education Law defines the practice of medicine as diagnosing, treating, operating, or prescribing for any human disease, pain, injury, deformity, or physical condition.

79. In a legitimate medical practice, diagnosis, and treatment decisions, including the ordering of diagnostic tests, must be performed by a licensed healthcare provider.

80. By determining what medical services to render and ostensibly by performing those services, Titan and Palmieri were engaged in the unlawful practice of medicine under New York law.

81. The Fraudulent Services allegedly provided by Titan were administered pursuant to fraudulent, predetermined protocols established by unlicensed laypersons, including Palmieri and the John Doe Defendants. In virtually all cases, the Fraudulent Services were performed – if they were performed at all – without legitimate referrals and without any determination of medical need by licensed professionals.

82. In a legitimate clinical setting, when there is a need for diagnostic testing, the decision to perform or order diagnostic testing must be recorded in a written or electronic request by a physician or licensed healthcare provider, which would include a detailed history of the patient's condition and the indications for the diagnostic testing.

83. For virtually all of the Defendants' claims for Vestibular studies and for most of the claims for the Defendant's Ultrasounds and Doppler studies, there were no prescriptions or referrals submitted for the purported testing.

84. In the few instances where "referral" documents were provided for the Ultrasounds and Doppler studies**,** they were undated, contained no details about any of the individual patients'

conditions or medical histories or indications for the testing, and were on Titan's letterhead, despite the fact that they were not signed by a licensed medical professional.

85. For example, the Defendants included a document labeled "Physician Referral Form" in some of their claim submissions for Ultrasound and Doppler studies. A representative copy of a Physician Referral Form is below:

Titan Diag. Imaging Services
"Excellence in Ultrasound"
Staten Island N.Y. 10309
Tel: (646) 335-5140 Fax: (888) 251-1086

*Physician Referral Form*

Patient Name: [redacted]

Age: 19 Date of Birth: [redacted] 2003 DOA: 06/10/2023

Referring Physician: Dr.

Claim# -

Insurance Co. -

Diagnosis Code/Symptoms: M54.12 M54.16 M62.830 R09.89 M79.603 R22.43 R07.9

- Echocardiogram (93306)
- Carotid Duplex Bilateral (93880)
- Transcranial (93886)
- Venous Doppler (93970)
- Arterial Doppler (93925)
- Abd. Aorta Duplex (93978)
- Upper Arterial (93930)
- ✓ Spine Ultrasound
- MSK Joint (76881)

202307170015403 MM 07172023
202307178044170027 Received Date 07172023

86. As shown above, the "referral" was on Titan's letterhead, even though Titan and Palmieri are not licensed to practice medicine, including rendering medical diagnoses and ordering diagnostic tests.

87. In addition to being undated and unsigned, the Physician Referral Forms submitted by the Defendants do not state the name or bear the signature of the purported referring physician, or provide any indication for the testing.

88. The Physician Referral Forms also include typed diagnosis codes and the services to be performed, that were subsequently circled by hand. Upon information and belief, this was to give the impression that a licensed physician was requesting the diagnostic services.

89. As the Defendants' "referral" neither identified nor bore the signature of any referring physician and was undated, it is impossible to determine whether the selection of the diagnosis codes on the referrals was legitimate or made by a licensed physician.

90. In some of their claim submissions to Allstate for Ultrasound, the Defendants included a document labeled "MSK Letter of Medical Necessity" (hereinafter, "LMN").

91. The LMNs were identical for every patient. They never provided details about the Insureds' specific medical conditions or histories or documented any indications for the testing.

92. Representative examples of the LMN's are annexed as Exhibit 2.

93. As can be seen in Exhibit 2 and the following chart, the Defendants' LMNs contain identical language for every patient, including the same reason for the "referral" and the same recommendation for Ultrasound testing:

| Claimant | Reason for Referral | Recommendation for Ultrasound |
|---|---|---|
| **LL 0748876299** | "has been referred for musculoskeletal diagnostic sonogram to evaluate his/her acute/subacute/chronic pain and segmental dysfunction of the joints and muscles of the back." | "I feel that there is a direct causal relationship between the accident described and the patient's current injuries to the described areas. The symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas. At this point, the patient remains impaired with regard to some functional capabilities, as such; I recommend that the patient have the MSK exam of the vertebrae." |
| **WY 0722118858** | "has been referred for musculoskeletal diagnostic sonogram to evaluate his/her acute/subacute/chronic pain and segmental dysfunction of the joints and muscles of the back." | "I feel that there is a direct causal relationship between the accident described and the patient's current injuries to the described areas. The symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas. At this point, the patient remains impaired with regard to some functional capabilities, as such; I recommend that the patient have the MSK exam of the vertebrae." |
| **BR 0792865099** | "has been referred for musculoskeletal diagnostic sonogram to evaluate his/her acute/subacute/chronic pain and segmental dysfunction of the joints and muscles of the back." | "I feel that there is a direct causal relationship between the accident described and the patient's current injuries to the described areas. The symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas. At this point, the patient remains impaired with regard to some functional capabilities, as such; I recommend that the patient have the MSK exam of the vertebrae." |
| **DJ 0791217755** | "has been referred for musculoskeletal diagnostic sonogram to evaluate his/her acute/subacute/chronic pain and segmental dysfunction of the joints and muscles of the back." | "I feel that there is a direct causal relationship between the accident described and the patient's current injuries to the described areas. The symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas. At this point, the patient remains impaired with regard to some functional capabilities, as such; I recommend that the patient have the MSK exam of the vertebrae." |
| **BW 0787684991** | "has been referred for musculoskeletal diagnostic sonogram to evaluate his/her acute/subacute/chronic pain and segmental dysfunction of the joints and muscles of the back." | "I feel that there is a direct causal relationship between the accident described and the patient's current injuries to the described areas. The symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas. At this point, the patient remains impaired with regard to some functional capabilities, as such; I recommend that the patient have the MSK exam of the vertebrae." |
| **AS 0778202234** | "has been referred for musculoskeletal diagnostic sonogram to evaluate his/her acute/subacute/chronic pain and segmental dysfunction of the joints and muscles of the back." | "I feel that there is a direct causal relationship between the accident described and the patient's current injuries to the described areas. The symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas. At this point, the patient remains impaired with regard to some functional capabilities, as such; I recommend that the patient have the MSK exam of the vertebrae." |

| | | |
|---|---|---|
| **DS 0755548765** | "has been referred for musculoskeletal diagnostic sonogram to evaluate his/her acute/subacute/chronic pain and segmental dysfunction of the joints and muscles of the back." | "I feel that there is a direct causal relationship between the accident described and the patient's current injuries to the described areas. The symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas. At this point, the patient remains impaired with regard to some functional capabilities, as such; I recommend that the patient have the MSK exam of the vertebrae." |
| **ZC 0738898996** | "has been referred for musculoskeletal diagnostic sonogram to evaluate his/her acute/subacute/chronic pain and segmental dysfunction of the joints and muscles of the back." | "I feel that there is a direct causal relationship between the accident described and the patient's current injuries to the described areas. The symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas. At this point, the patient remains impaired with regard to some functional capabilities, as such; I recommend that the patient have the MSK exam of the vertebrae." |
| **CC 0774384358** | "has been referred for musculoskeletal diagnostic sonogram to evaluate his/her acute/subacute/chronic pain and segmental dysfunction of the joints and muscles of the back." | "I feel that there is a direct causal relationship between the accident described and the patient's current injuries to the described areas. The symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas. At this point, the patient remains impaired with regard to some functional capabilities, as such; I recommend that the patient have the MSK exam of the vertebrae." |
| **EA 0778317867** | "has been referred for musculoskeletal diagnostic sonogram to evaluate his/her acute/subacute/chronic pain and segmental dysfunction of the joints and muscles of the back." | "I feel that there is a direct causal relationship between the accident described and the patient's current injuries to the described areas. The symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas. At this point, the patient remains impaired with regard to some functional capabilities, as such; I recommend that the patient have the MSK exam of the vertebrae." |

94. In addition, as can be seen above, all of the identical recommendations are vague; they fail to identify the current injuries, the described areas, the impairments, the symptoms, or the clinical findings.

95. It is highly implausible, if not impossible, that virtually every patient, each with their own unique set of individual circumstances, body type, position in the vehicle, medical history, and accident dynamics, would have the exact same “symptoms” and “clinical findings,” and all be in the same condition when they presented to Titan.

96. It is clear that the LMNs were intended to deceive insurers and patients that the determination to have the patient undergo Ultrasound testing was made by a licensed healthcare provider, based upon their medical judgment and the patient's individualized circumstances.

97. Moreover, none of the treatment records by the alleged referring providers even reference Ultrasound testing, let alone prescribe or refer patients for it; the test results were not documented in the medical treatment records and the diagnostic testing results had no impact on the treatment plans, further reinforcing the fraudulent nature of the protocol in use.

98. The fact that the majority of Ultrasound tests were unsupported by any physician prescription, and that many of the purported referrals that did exist were plainly not the product of independent medical judgment, demonstrates that the Defendants performed Ultrasound without any legitimate physician authorization or patient need.

99. The same pattern of absent physician oversight and unauthorized medical decision-making by unlicensed individuals also extended to the Defendants' claims for Vestibular testing. For virtually all of those claims, the Defendants submitted no prescriptions, clinical documentation, or other records establishing any legitimate medical basis or individualized indication for the exams allegedly performed.

100. This further evidences that the medical decision-making for diagnosing the Insureds and determining that diagnostic testing was medically necessary were made by unlicensed individuals and not by medical professionals.

101. This pattern demonstrates that Titan and Palmieri were not merely performing ministerial or clerical functions; rather, they were determining what medical services patients would receive and purportedly performing those services, thereby engaging in the unlawful practice of medicine under New York law.

102. To conceal this unlawful practice of medicine, Titan's bills falsely state that it only performed the technical component of the Fraudulent Services.

103. However, for virtually all of the Ultrasound claims, Titan, a non-professional corporation, also purported to *interpret* the Ultrasounds they allegedly rendered, despite not being qualified or licensed to do so.

104. The services purportedly performed by Titan consist of sophisticated diagnostic testing that requires proper licensure, training, and medical oversight. In legitimate medicine, such testing is performed only when ordered by a licensed healthcare provider and, where applicable, carried out by appropriately qualified personnel. Here, however, the individuals who allegedly performed the testing were not qualified or licensed to do so, let alone qualified to interpret the results, render diagnostic conclusions, or determine the patient's course of care.

105. Titan's own records demonstrate that it did not merely perform technical imaging services. Rather, Titan interpreted Ultrasound tests, rendered diagnostic conclusions, and communicated medical findings. Such activities require the exercise of professional medical judgment and constitute the unlawful practice of medicine. Ultrasound testing has specific indications, and it is not routinely necessary or performed for patients with soft tissue injuries.

106. A representative example of an Ultrasound report submitted by the Defendants for Patient JGR (Claim No. 789397840) is below. This is not an isolated example; it is one of many substantially similar reports the Defendants repeatedly submitted to create the false appearance of legitimate medical interpretations.

**MSK Ultrasound of the Cervical vertebra,**
**Facet joints and soft tissues of the spine**

---

**Date of service: 4/22/25**
**Patient name: [redacted]**
**DOB [redacted] 76 DOA: 4/7/25**
**Ref. Physician: Walter Mendoza DC**
**Diag. – S13.4**

**PRELIMINARY**

**CLINICAL DATA**
The patient presents with continued evidence of aberrant spinal biomechanics, including changes in normal vertebral segmental movement and potential aberrations in the tissues which support articular function. **Complete** Ultrasonography of the cervical vertebrae, including adjacent ligaments and muscular structures was performed to demonstrate the presence or absence of sonographically demonstrable abnormalities in these vertebral and paravertebral tissues, erector spinae, interspinales, intertransversarii, levator scapulae, multifidus, rhomboid minor, rotatores, semispinalis, splenius capitis, and trapezius soft tissues. Multiple sonographic images were obtained of the cervical vertebral tissue transversely from C1 through C7 and bilateral trapezius muscles.

**FINDINGS:** Examination of the C1-C7 levels demonstrates no evidence of cystic or solid soft tissue mass. Abnormal acoustic dropout is seen at the posterior spinous processes.
*Paraspinal muscles:* An abnormal acoustic pattern is seen in the patients paraspinal musculature. The muscular and fascial planes are preserved. The right & left trapezius muscle is visualized and appears abnormally hypoechoic. Some swelling and hypo echogenicity is visualized along the multifidus and latissimus dorsi muscles bilaterally.

*Facet joints*: Joint capsule appears hyperechoic. Inflammatory response is visualized in the joints.
Patient presents with back pain and tightness post trauma. The patient presents with evidence of aberrant spinal biomechanics including changes in normal spinal segmental movement and potential aberrations in the tissues which support articular function. Ultrasonography of the lumbar vertebrae was performed to demonstrate the presence or absence of any inflammation in these articular tissues and lumbar facet joints.

**TECHNIQUE:** Utilizing a 5-12 MHZ variable transducer, static transverse images were obtained from C1-C7.

**IMPRESSION: Sonographic imaging of the cervical vertebrae revealed evidence of articular and/or soft tissue inflammatory changes consistent with nerve irritation. Bilateral swelling of the cervical paraspinal muscle consistent with a significant muscle spasm.** An abnormal acoustic pattern is visualized in the bilateral paraspinal musculature, which in conjunction with the appropriate clinical findings is compatible with paraspinal muscle spasms. Mild swelling of the right and left upper trapezius muscle consistent with mild muscle spasm. Moderate inflammatory response consistent with trauma noted around the C4/C5/C6 vertebral & zygapophyseal joints with multifidus muscle swelling/strains, right upper trapezius and interspinalis strains.

Interpreting Physician

Test Performed by:
Titan Diagnostic Imaging

Tech: Donara Rorentals

107. As shown above, Titan's Ultrasound reports state that the Ultrasound "…was performed to demonstrate the presence or absence of sonographically demonstratable abnormalities." It then provides the "Findings" and an "Impression" of the Ultrasound results, diagnosing the patient with muscle spasms and trauma. Even if these findings were legitimate, they had no impact on treatment plan decisions

108. As also reflected in the report above, in an effort to create a veneer of legitimacy, the end of Titan's Ultrasound report is labeled "Interpreting Physician", giving the appearance that a licensed physician interpreted the diagnostic test.

109. As to Titan's purported VNG testing, as with the Ultrasound, Titan's billing records indicated that it was seeking reimbursement for only the technical component. However, for virtually all VNG claims, Titan, a non-professional corporation, also purported to interpret these test results, despite the fact that they are not qualified or licensed to do so.

110. With most of their claim submissions for VNG, the Defendants included a document entitled "Videonystagmography (VNG) Interpretation" (hereinafter, "VNG Interpretation").

111. Representative examples of the Defendants' VNG Interpretations are annexed as Exhibit 3.

112. As can be seen from Exhibit 3, virtually all of the VNG Interpretations submitted by Titan provide a "Summary and Impression" of the VNG test results and "Recommendations".

113. Titan's "Summary and Impression" and "Recommendations" were identical across virtually all of its patients, thereby confirming that this testing was unnecessary, not based upon patients' individualized needs and part of a pre-determined fraudulent protocol.

114. Below are representative examples:

*Patient MR (Claim No. 0721783496)*

**Summary and Impression:** Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

**Recommendations:** Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

*Patient VR (Claim No. 0721783496)*

**Summary and Impression:** Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

**Recommendations:** Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

*Patient AA (Claim No. 0724142211)*

**Interpretation/Summary:** Of the test performed normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

**Recommendations:** Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

*Patient MS (Claim No. 0724142211)*

**Summary and Impression:** Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

**Recommendations:** Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

*Patient MA (Claim No. 0725108443)*

**Summary and Impression:** Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

**Recommendations:** Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

*Patient RS (Claim No. 0728701798)*

**Summary and Impression:** Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

**Recommendations:** Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

*Patient GG (Claim No. 0728835959)*

**Summary and Impression:** Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

**Recommendations:** Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

*Patient ZC (Claim No. 0738898996)*

**Summary and Impression:** Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

**Recommendations:** Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

*Patient KAM (Claim No. 0740675897)*

**Summary and Impression:** Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

**Recommendations:** Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

*Patient JY (Claim No. 0741419121)*

**Summary and Impression:** Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

**Recommendations:** Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

*Patient JB (Claim No. 0744357757)*

**Summary and Impression:** Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

**Recommendations:** Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

*Patient JR (Claim No. 0772382339)*

**Summary and Impression:** Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

**Recommendations:** Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

*Patient CC (Claim No. 0774384358)*

**Summary and Impression:** Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

**Recommendations:** Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

*Patient SGS (Claim No. 0776410994)*

**Summary and Impression:** Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

**Recommendations:** Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

115. The notion that virtually every patient would receive the same exact "Summary and Impression" and "Recommendations," notwithstanding the patients' differing symptoms, histories, and clinical presentations, is highly implausible if not impossible. Moreover, Titan's issuance of "impressions" and "recommendations" confirms that it was performing medical, rather than merely technical, functions. The formulation of diagnostic impressions and clinical recommendations necessarily involves the exercise of professional medical judgment and constitutes the practice of medicine.

116. Titan ostensibly performed VNG testing despite the absence of patient complaints or objective clinical findings that would prompt such testing, and, according to the VNG

Interpretations, virtually all of the results were negative. This confirms that the testing was not undertaken to address individualized patient need, but rather to generate reimbursable billing.

117. New York law defines the practice of medicine to include diagnosing, treating, operating on, or prescribing for any human disease, pain, injury, deformity, or physical condition; the interpretation of diagnostic test results to render findings, impressions, or recommendations falls squarely within that definition.

118. In a legitimate clinical setting, patients require and must receive individualized care and not be subject to a predetermined, one-size-fits-all protocol. By interpreting medical test results, and by issuing recommendations for future medical care, Titan and Palmieri were engaged in the unlawful practice of medicine under New York law.

**C. Unlicensed Rendering of Radiologic Services**

119. In addition to engaging in the unauthorized practice of medicine, for virtually every claim that included radiologic testing, the Defendants engaged in the unauthorized practice of radiologic technology in violation of New York Public Health Law § 3502, which requires that such services be performed only by duly licensed individuals.

120. New York law requires that radiologic services be performed by licensed radiologic technologists or under the supervision of a licensed practitioner, which is limited to physicians, dentists, podiatrists, and chiropractors. See 10 N.Y.C.R.R. §§ 89.1–89.2.

121. Palmieri is not a physician, dentist, podiatrist, or chiropractor. Nor is Palmieri licensed in New York as a radiologic technologist. He is therefore not licensed or qualified to perform or supervise radiologic services.

122. Nevertheless, Titan billed Allstate for the performance of thousands of Ultrasound and Doppler tests in violation of New York Public Health Law §§ 3501 and 3502.3.

### D. Titan Was Not Organized With State Regulators as a Licensed Healthcare Provider and Is Illegible For No-Fault Payments

123. As alleged above, the Defendants were engaged in the unlawful practice of medicine. Accordingly, the claims they submitted are not reimbursable. Moreover, even assuming arguendo that Defendants sought reimbursement solely for the technical component of the Fraudulent Services, which they did not, the claims remain non-reimbursable.

124. New York State has extensive licensing regulations for entities that render professional healthcare services. A proper license and providing services within the scope of that license is a prerequisite to payment under New York's No-Fault laws. An entity is not eligible to receive No-Fault Benefits if it is not professionally licensed.

125. Although Titan is not a licensed provider, and Palmieri is not a licensed professional health care provider, Titan submitted claims to Allstate seeking reimbursement for health-related services.

126. The New York Department of Financial Services ("DFS") has broad power to interpret, clarify, and implement the legislative policy by promulgating regulations. See Insurance Law § 301. The DFS publishes a frequently asked questions ("FAQ") publication regarding the reimbursement of treatment under the No-Fault Fee Schedule. In its FAQ, the DFS had directed that treatment is not reimbursed when rendered by a non-licensed individual:

> Q: Would a medical PC be eligible for reimbursement of biofeedback services rendered by a technician, working under the direct and personal supervision of a Board-certified internist, both of whom possess a training certificate in biofeedback?
>
> A: No, only those services actually performed by the licensed professional (i.e., an internist) which are within the lawful scope of the licensee's practice are eligible for reimbursement by No-Fault.

127. Further, in its letter of June 11, 2001, the DFS stated:

> With regard to the services the inquirer referred to, none of these services specified are reimbursable as covered health expenses unless they are specifically provided by health professionals who are licensed by the State of New York to perform such services.

128. Pursuant to the Fee Schedule and the DFS Publications, only professional licensed individuals, and entities (i.e., professional corporations, professional limited liability corporations, hospitals, and ambulatory surgery centers) are entitled to reimbursement of No-Fault Benefits, including payments for technician fees.

129. As neither Palmieri nor Titan are professionally licensed, they are therefore not eligible to receive No-Fault reimbursement for technical or professional fees under New York State law.

### E. Gaining Access to Insureds Through Illicit Arrangements with No-Fault Clinics

130. Titan was not a legitimate healthcare practice and had no legitimate patient base. It did not advertise or make any legitimate efforts to attract patients. In order to gain access to patients whose insurance benefits could be used to bill Allstate and other insurers, Titan entered into illicit arrangements with the Clinic Controllers of numerous Clinics located throughout the New York City Metropolitan Area. Pursuant to these agreements, Defendants acquired the right to perform designated diagnostic services, including ultrasound, Doppler, and vestibular testing, on a prearranged basis in exchange for cash payments to the Clinic Controllers.

131. Each Clinic was designed to appear as a single healthcare practice offering a wide range of services (e.g., chiropractic, physical therapy, mental health, medical equipment, etc.), all under one roof, to victims of motor vehicle accidents. In reality, the Clinics were medical mills established for the sole purpose of submitting inflated, fraudulent billing to Allstate and other insurers. Clinics similar in nature were identified by the Insurance Information Institute as the

engine that drives No-Fault fraud and operate solely for the pecuniary benefit of their unlicensed lay owners.[2]

132. Titan did not maintain an independent office space at any single, fixed location. Instead, Titan purported to operate out of the following fifty-nine (59) Clinics located throughout the New York City Metropolitan Area:

| **Street Address** | **City** | **County** |
|---|---|---|
| 1 Fulton Avenue | Hempstead | Nassau |
| 1214 Coney Island Avenue | Brooklyn | Kings |
| 1314 Coney Island Avenue | Brooklyn | Kings |
| 1339 E Gun Hill Road | Bronx | Bronx |
| 133-49 41st Avenue | Flushing | Queens |
| 14 Bruckner Boulevard | Bronx | Bronx |
| 145 East 98th Street | Brooklyn | Kings |
| 1500 Astor Avenue | Bronx | Bronx |
| 152 80 Rockaway Blvd | Jamaica | Queens |
| 1550 Astor Avenue | Bronx | Bronx |
| 157-40 Cross Bay Boulevard | Howard Beach | Queens |
| 170 West 233rd Street | Bronx | Bronx |
| 175 Fulton Avenue | Hempstead | Nassau |
| 1800 Astor Avenue | Bronx | Bronx |
| 180-09 Jamaica Avenue | Jamaica | Queens |
| 1849 Utica Avenue | Brooklyn | Kings |
| 1877 Webster Avenue | Bronx | Bronx |
| 215-19 39th Avenue | Bayside | Queens |
| 2100 Bartow Avenue | Bronx | Bronx |
| 2118 Coney Island Avenue | Brooklyn | Kings |
| 2184 Flatbush Avenue | Brooklyn | Kings |
| 222 Mamaroneck Ave | White Plains | Westchester |
| 222-01 Hempstead Avenue | Queens Village | Queens |
| 2354 Westchester Avenue | Bronx | Bronx |
| 2422 Knapp Street | Brooklyn | Kings |
| 2425 Eastchester Road | Bronx | Bronx |
| 243-35 Merrick Boulevard | Rosedale | Queens |
| 2598 3rd Avenue | Bronx | Bronx |
| 2733 Wehrle Drive | Buffalo | Erie |
| 3055 3rd Avenue | Bronx | Bronx |
| 3060 E. Tremont Road | Bronx | Bronx |
| 31 Guy Lombardo Avenue | Freeport | Nassau |

[2] https://www.iii.org/article/no-fault-insurance-fraud-new-york-state-ramping-premiums

| | | |
|---|---|---|
| 3207 White Plain Road | Bronx | Bronx |
| 3407 White Plains Road | Allerton | Bronx |
| 3500 E Tremont Avenue | Bronx | Bronx |
| 3501 Queens Boulevard | Long Island City | Queens |
| 37 Smith Street | Glen Cove | Nassau |
| 399 Lake Avenue | Staten Island | Richmond |
| 4009 Church Avenue | Brooklyn | Kings |
| 41-09 108th Street | Corona | Queens |
| 480 E Jericho Turnpike | Huntington Station | Suffolk |
| 496 Jerusalem Avenue | Uniondale | Nassau |
| 513 Church Avenue | Brooklyn | Kings |
| 5372 Merrick Road | Massapequa | Nassau |
| 550 Remsen Avenue | Brooklyn | Kings |
| 607 Westchester Avenue | Bronx | Bronx |
| 6269 99th Street | Flushing | Queens |
| 632 Utica Avenue | Brooklyn | Kings |
| 652 E Fordham Road | Bronx | Bronx |
| 788 Southern Boulevard | Bronx | Bronx |
| 79-45 Metropolitan Avenue | Middle Village | Queens |
| 81 05 Baxter Avenue | Elmhurst | Queens |
| 82-17 Woodhaven Boulevard | Glendale | Queens |
| 82-25 Queens Boulevard | Elmhurst | Queens |
| 823 56th Street, 3rd Floor | Brooklyn | Kings |
| 9 West Sunrise Highway | Freeport | Nassau |
| 903 Sheridan Avenue | Bronx | Bronx |
| 900B E. Tremont Avenue | Bronx | Bronx |
| 90-46 Corona Avenue | Elmhurst | Queens |
| 9413 Flatlands Avenue | Brooklyn | Kings |

133. The pre-determined treatment protocol at the Clinics is evidenced, in part, by the sheer number of entities that purported to treat the same Insureds, at the same locations. For example:

(i) Titan, along with twenty-three (23) other entities, billed Allstate for treatment purportedly rendered to Insured IA (Claim No. 0798152609) in connection with their alleged June 19, 2025, motor accident ("MVA") at the Clinic located at 2422 Knapp Street, Brooklyn, NY.

(ii) Titan, along with eleven (11) other entities, billed Allstate for treatment purportedly rendered to Insured SW (Claim No. 0787684991) in connection with their alleged March 22, 2025, MVA at the Clinic located at 632 Utica Avenue, Brooklyn, NY.

(iii) Titan, along with twelve (12) other entities, billed Allstate for treatment purportedly rendered to Insured MP (Claim No. 0766138969) in connection with their alleged August 18, 2024, MVA at the No-Fault Clinic located at 3501 Queens Boulevard, Long Island City, NY.

(iv) Titan, along with thirteen (13) other entities, billed Allstate for treatment purportedly rendered to Insured DL (Claim No. 0765554860) in connection with their alleged August 12, 2024, MVA at the Clinic located at 1 Fulton Avenue, Hempstead, NY.

(v) Titan, and eleven (11) other entities, billed Allstate for treatment purportedly rendered to Insured ACL (Claim No. 0755548765) in connection with their alleged May 16, 2024, MVA at the Clinic located at 90-46 Corona Avenue, Elmhurst, NY.

(vi) Titan, along with thirteen (13) other entities, billed Allstate for treatment purportedly rendered to Insured NMR (Claim No. 0713581445) in connection with their alleged May 11, 2023, MVA at the Clinic located at 31 Guy Lombardo Avenue, Freeport, NY.

(vii) Titan, along with thirteen (13) other entities, billed Allstate for treatment purportedly rendered to Insured DCR (Claim No. 0713581445) in connection with their alleged May 11, 2023, MVA at the Clinic located at 31 Guy Lombardo Avenue, Freeport, NY.

(viii) Titan, along with thirteen (13) other entities, billed Allstate for treatment purportedly rendered to Insured PC (Claim No. 0806277299) in connection with their alleged August 28, 2025, MVA at the Clinic located at 9 West Sunrise Highway, Freeport, NY.

(ix) Titan, along with eleven (11) other entities, billed Allstate for treatment purportedly rendered to Insured MS (Claim No. 0724142211) in connection with their alleged July 21, 2023, MVA at the Clinic located at 3060 E. Tremont Avenue, Bronx, NY.

(x) Titan, along with eleven (11) other entities, billed Allstate for treatment purportedly rendered to Insured AC (Claim No. 0730670940) in connection with their alleged September 28, 2023, MVA at the Clinic located at 607 Westchester Avenue, Bronx, NY.

134. These are only representative examples. In many of the claims identified in Exhibit 1, Allstate received billing from numerous medical entities purportedly operating within the same office, for treatment purportedly rendered to the same Insured and as a result of the same accident.

135. The presence of numerous distinct healthcare providers from a wide range of specialties operating out of a single location makes clear that treatment is being predetermined and coordinated for purposes of maximum reimbursement. It is implausible that as many as twenty-three (23) distinct specialties would be present at the same office and routinely be needed to care for the same patient on an ongoing basis with each provider claiming to perform specific treatment that is exclusive and distinct from each of the other providers. In reality, this can only happen because it is actually the layperson clinic staff coordinating the care regimen so that each provider gets to bill for each patient regardless of whether the services are necessary for the individual patient.

136. Further, many of these Clinic locations have been identified in criminal and civil racketeering actions alleging large scale healthcare fraud schemes. Annexed as Exhibit 4 is a chart of service locations used by Titan and the numerous civil racketeering complaints involving each location.

137. Defendants knew that their patient base was received as part of illicit clinic arrangements. These arrangements between the Defendants and the Clinics played an integral and necessary role in carrying out the Fraudulent Scheme against Allstate. Without these illicit arrangements, Titan would have no mechanism to demand payment from Plaintiffs because it did not have any legitimate patients whose insurance benefits could be used for purposes of seeking payment for the Fraudulent Services.

**F. The Defendants' Fraudulent Testing and Billing Protocol**

138. Regardless of the mechanism of the Insureds' accidents, their complaints, individualized presentations, physical findings, or provisional diagnoses, the Defendants purported to subject virtually all Insureds to the same predetermined treatment protocol. That protocol

virtually always included Ultrasound, Vestibular, and/or Doppler testing, without regard to whether any clinical indication existed for those services. The Fraudulent Services provided no diagnostic or therapeutic value to the Insureds, were virtually never referenced in the clinical documentation, and did not result in any meaningful alteration or adjustment to their treatment plans.

139. No legitimate physician or licensed healthcare provider would permit the fraudulent treatment and billing protocols described below to proceed under his or her auspices. Rather, the Defendants permitted the fraudulent treatment and billing protocols to proceed because they were acting in furtherance of a common healthcare fraud scheme, directed by Palmieri and other unlicensed laypersons designed to maximize profits, while providing no legitimate benefit to the Insureds.

### i. The Fraudulent Charges for the Technical Component of Ultrasound Tests

140. The Defendants purported to subject many Insureds to multiple fraudulent and medically unnecessary Ultrasound tests. Titan billed Allstate for performing musculoskeletal diagnostic ultrasounds of the spine, under CPT code 76800, and diagnostic ultrasounds of extremity joints, under CPT code 76881.

141. The Ultrasounds were rendered, to the extent rendered at all, unnecessarily and absent any legitimate medical indications and pursuant to fraudulent treatment protocols, implemented by the unlicensed Defendants, to maximize profits without regard to patient care.

#### a. Purported Referrals Unsupported by Patient Evaluations

142. The decision to order a particular diagnostic test should be guided by the patient's individualized clinical needs – not by a predetermined protocol.

143. In legitimate medical practice, diagnostic tests, such as ultrasounds, are generally requested only after a licensed treating healthcare provider has conducted a thorough history and physical examination to determine the etiology of a patient's symptoms, and to clarify or render a diagnosis aimed at adjusting the patient's treatment plan.

144. As discussed above, where the Defendants did identify a purported "referring provider" for the Ultrasounds, in virtually all cases, that provider failed to make any reference in their examination records that he/she had prescribed Ultrasound testing, or for what purpose. This is virtually unheard of in a legitimate medical setting, where diagnostic testing is ordered only after a qualified healthcare provider has examined the patient and documented that such testing is clinically indicated, in order to individualize the patient's treatment plan.

145. Additionally, in some of the cases where the Defendants did identify a purported referring provider, there was no indication that this provider ever examined the patient.

146. The following are representative examples in which the referring providers' examination reports failed to reference the purported Ultrasound referral:

(i) Titan supported its Ultrasound billing for Insured WY, (Claim No. 0722118858) with an undated LMN allegedly signed by referring practitioner CHP. None of the referring practitioner's reports for this patient contain any reference to Ultrasounds.

(ii) Titan supported its Ultrasound billing for Insured NK, (Claim No. 0766096860) with an undated LMN allegedly signed by referring practitioner RF. None of the referring practitioner's reports for this patient contain any reference to Ultrasounds.

(iii) Titan supported its Ultrasound billing for Insured NJ, (Claim No. 0776160608) with an undated LMN allegedly signed by referring practitioner RAR. None of the referring practitioner's reports for this patient contain any reference to Ultrasounds.

(iv) Titan supported its Ultrasound billing for Insured MC, (Claim No. 0776150625) with an undated LMN allegedly signed by referring practitioner

QKS. None of the referring practitioner's reports for this patient contain any reference to Ultrasounds.

(v) Titan supported its Ultrasound billing for Insured JD, (Claim No. 0777754656) with an undated LMN allegedly signed by referring practitioner QKS. None of the referring practitioner's reports for this patient contain any reference to Ultrasounds.

(vi) Titan supported its Ultrasound billing for Insured DS, (Claim No. 0782709877) with an undated LMN allegedly signed by referring practitioner HH. None of the referring practitioner's reports for this patient contain any reference to Ultrasounds.

(vii) Titan supported its Ultrasound billing for Insured AH, (Claim No. 0784196866) with an undated LMN allegedly signed by referring practitioner WM. None of the referring practitioner's reports for this patient contain any reference to Ultrasounds.

(viii) Titan supported its Ultrasound billing for Insured NS, (Claim No. 0779482454) with an undated LMN allegedly signed by referring practitioner WM. None of the referring practitioner's reports for this patient contain any reference to Ultrasounds.

(ix) Titan supported its Ultrasound billing for Insured SW, (Claim No. 0787684991) with an undated LMN allegedly signed by referring practitioner GR. None of the referring practitioner's reports for this patient contain any reference to Ultrasounds.

(x) Titan supported its Ultrasound billing for Insured BW, (Claim No. 0787684991) with an undated LMN allegedly signed by referring practitioner GR. None of the referring practitioner's reports for this patient contain any reference to Ultrasounds.

147. The following are representative examples in which the alleged referring provider never produced any documentation showing that he or she ever examined the patient at all.

(i) Titan supported its Ultrasound billing for Insured JY, (Claim No. 0741419121) with an undated LMN allegedly signed by referring practitioner CHP. There is no indication that the referring practitioner ever examined this patient.

(ii) Titan supported its Ultrasound billing for Insured JV, (Claim No. 0762374080) with an undated LMN allegedly signed by referring practitioner GR. There is no indication that the referring practitioner ever examined this patient.

(iii) Titan supported its Ultrasound billing for Insured MP, (Claim No. 0766138969) with an undated LMN allegedly signed by referring practitioner MP. There is no indication that the referring practitioner ever examined this patient.

(iv) Titan supported its Ultrasound billing for Insured DG, (Claim No. 0774187132) with an undated LMN allegedly signed by referring practitioner RAR. There is no indication that the referring practitioner ever examined this patient.

(v) Titan supported its Ultrasound billing for Insured JA, (Claim No. 0785470295) with an undated LMN allegedly signed by referring practitioner RF. There is no indication that the referring practitioner ever examined this patient.

(vi) Titan supported its Ultrasound billing for Insured KJ, (Claim No. 0783228489) with an undated LMN allegedly signed by referring practitioner RR. There is no indication that the referring practitioner ever examined this patient.

(vii) Titan supported its Ultrasound billing for Insured RB, (Claim No. 0792865099) with an undated LMN allegedly signed by referring practitioner HH. There is no indication that the referring practitioner ever examined this patient.

**b. Excessive Referrals for Ultrasounds Deviate from Acceptable Standards of Care**

148. Even assuming arguendo that the Defendants received a facially valid prescription or referral, no legitimate healthcare professional would prescribe diagnostic ultrasounds, or any other diagnostic testing, in the manner allegedly prescribed as part of the Fraudulent Scheme.

149. With musculoskeletal complaints following minor motor vehicle accidents, such injuries are generally mild soft tissue injuries involving muscles, ligaments, tendons, or other connective tissue, and tend to resolve within two (2) to six (6) weeks without the need for advanced imaging.

150. The standard of care for such patients, among other things, dictates that advanced imaging is not performed immediately, if ever, following soft tissue injuries. Instead, licensed

healthcare providers typically allow for a period of conservative treatment – often at least thirty (30) days – to assess whether a patient's condition improves without the need for advanced diagnostics.

151. Titan purportedly performed the Ultrasounds prematurely and unnecessarily, often as early as within the first week post-accident, failing to give the Insureds an opportunity to respond to conservative therapy.

152. By way of representative example:

(i) On June 13, 2023, Insured AE (Claim No. 0717429567) was involved in an MVA. On the same day, on June 13, 2023, Insured AE underwent diagnostic ultrasounds purportedly performed by Titan.

(ii) On October 3, 2023, Insured CH (Claim No. 0731175873) was involved in an MVA. Three days later, on October 6, 2023, Insured CH underwent diagnostic ultrasounds purportedly performed by Titan.

(iii) On March 1, 2025, Insured JA (Claim No. 0785470295) was involved in an MVA. Three days later, on March 4, 2025, Insured JA underwent diagnostic ultrasounds purportedly performed by Titan.

(iv) On June 10, 2023, Insured SPG (Claim No. 0717318448) was involved in an MVA. Four days later, on June 14, 2023, Insured SPG underwent diagnostic ultrasounds purportedly performed by Titan.

(v) On May 31, 2024, Insured AMG (Claim No. 0757798003) was involved in an MVA. Four days later, on June 4, 2024, Insured AMG underwent diagnostic ultrasounds purportedly performed by Titan.

(vi) On November 15, 2024, Insured HAM (Claim No. 0776971020) was involved in an MVA. Four days later, on November 19, 2024, Insured HAM underwent diagnostic ultrasounds purportedly performed by Titan.

(vii) On May 11, 2025, Insured BT (Claim No. 0792711699) was involved in an MVA. Five days later, on May 16, 2025, Insured BT underwent diagnostic ultrasounds purportedly performed by Titan.

(viii) On July 4, 2023, Insured MR (Claim No. 0721783496) was involved in an MVA. Six days later, on July 10, 2023, Insured MR underwent diagnostic ultrasounds purportedly performed by Titan.

(ix) On November 19, 2024, Insured NJ (Claim No. 0776160608) was involved in an MVA. Seven days later, on November 26, 2024, Insured NJ underwent diagnostic ultrasounds purportedly performed by Titan.

(x) On May 11, 2023, Insured DCR (Claim No. 0713581445) was involved in an MVA. Eight days later, on May 19, 2023, Insured DCR underwent diagnostic ultrasounds purportedly performed by Titan.

(xi) On May 13, 2025, Insured RB (Claim No. 0792865099) was involved in an MVA. Nine days later, on May 22, 2025, Insured RB underwent diagnostic ultrasounds purportedly performed by Titan.

(xii) On June 30, 2023, Insured JV (Claim No. 0720877349) was involved in an MVA. Ten days later, on July 10, 2023, Insured JV underwent diagnostic ultrasounds purportedly performed by Titan.

(xiii) On March 22, 2025, Insured BW (Claim No. 0787684991) was involved in an MVA. Eleven days later, on April 2, 2025, Insured BW underwent diagnostic ultrasounds purportedly performed by Titan.

(xiv) On September 28, 2023, Insured AC (Claim No. 0730670940) was involved in an MVA. Thirteen days later, on October 11, 2023, Insured AC underwent diagnostic ultrasounds purportedly performed by Titan.

153. The Defendants' "shotgun approach" to Ultrasound testing lacked clinical specificity and reflected a clear departure from individualized medical assessment and judgment – particularly in the context of a walk-in clinic treating patients with minor soft tissue injuries, following motor vehicle accidents. Rather than being guided by legitimate clinical need, this indiscriminate, volume-driven use of diagnostic ultrasound testing further underscores the existence of the common fraudulent, predetermined treatment protocol.

154. Moreover, Ultrasound is not a first-line imaging modality or screening tool for patients with musculoskeletal injuries resulting from minor motor vehicle accidents. Ultrasounds are rarely utilized to evaluate musculoskeletal injuries, as they offer minimal diagnostic value compared to more appropriate imaging modalities such as X-rays, CT scans, or MRIs. In the

management of musculoskeletal and soft tissue injuries, ultrasounds are only necessary when standard imaging testing is contraindicated.

155. An MRI is considered a more specific diagnostic tool than an ultrasound, when viewing larger areas of soft tissue, joints, bones, muscles, or cartilage. Rarely in a legitimate medical practice that includes a multitude of patients with minor soft tissue injuries, would a healthcare provider prescribe an MRI and an ultrasound in close succession, without a specific indication to do so; such indications are rarely encountered in this clinical setting. When a patient undergoes a musculoskeletal diagnostic ultrasound shortly after an MRI, the ultrasound virtually never provides any additional information to the treating healthcare provider. This is particularly true in the setting of a patient population in which minor soft tissue injuries prevail.

156. Nevertheless, Titan routinely purportedly rendered Ultrasounds on Insureds who had already undergone an MRI, sometimes on the same day. Below are representative examples:

(i) Insured MP (Claim No. 0734760218) underwent MRIs of the cervical spine and lumbar spine on November 21, 2023. On the same day, Titan billed Allstate for ultrasounds purportedly performed on the same body parts.

(ii) Insured ST (Claim No. 0734760218) underwent MRIs of the cervical spine and lumbar spine on November 21, 2023. On the same day, Titan billed Allstate for ultrasounds purportedly performed on the same body parts.

(iii) Insured JW (Claim No. 0790755433) underwent MRIs of the cervical spine and lumbar spine on May 29, 2025. On the same day, Titan billed Allstate for ultrasounds purportedly performed on the same body parts.

(iv) Insured DG (Claim No. 0774187132) underwent MRIs of the cervical spine and lumbar spine on November 26, 2024. On the same day, Titan billed Allstate for ultrasounds purportedly performed on the same body parts.

(v) Insured WCT (Claim No. 0766501968) underwent MRIs of the cervical spine and lumbar spine on September 16, 2024. Two days later, Titan billed Allstate for ultrasounds purportedly performed on the same body parts.

(vi) Insured DP (Claim No. 0795221001) underwent MRIs of the cervical spine, thoracic spine, and lumbar spine on June 23, 2025. Three days later, Titan billed Allstate for ultrasounds purportedly performed on the same body parts.

(vii) Insured MQ (Claim No. 0791256902) underwent MRIs of the cervical spine, thoracic spine, and lumbar spine on May 19, 2025. Four days later, Titan billed Allstate for ultrasounds purportedly performed on the same body parts.

(viii) Insured EM (Claim No. 0740392568) underwent an MRI of the cervical spine on January 30, 2024, and MRIs of the thoracic spine and lumbar spine on January 31, 2024. Less than a week later, Titan billed Allstate for ultrasounds purportedly performed on the same body parts.

(ix) Insured KW (Claim No. 0789815759) underwent an MRI of the cervical spine and the lumbar spine on May 1, 2025. Less than a month later, Titan billed Allstate for ultrasounds purportedly performed on the same body parts.

(x) Insured EM (Claim No. 0740392568) underwent an MRI of the cervical spine on July 14, 2024, and an MRI of the thoracic spine on July 15, 2024. Less than a month later, Titan billed Allstate for ultrasounds purportedly performed on the same body parts.

(xi) Insured FE (Claim No. 0763380003) underwent an MRI of the cervical spine on September 11, 2024, and an MRI of the lumbar spine on September 24, 2024. Less than a month later, Titan billed Allstate for ultrasounds purportedly performed on the same body parts.

(xii) Insured JR (Claim No. 0772382339) underwent an MRI of the cervical spine and lumbar spine on September 5, 2024. Less than a month later, Titan billed Allstate for ultrasounds purportedly performed on the same body parts.

(xiii) Insured VR (Claim No. 0788470599) underwent an MRI of the lumbar spine on May 12, 2025. Less than a month later, Titan billed Allstate for an ultrasound purportedly performed on the same body part.

**c. Defendants' Fraudulent Spinal Ultrasound Protocol**

157. Titan, in connection with many of the bills it submitted to Allstate, charged for musculoskeletal diagnostic ultrasounds of the spine (hereinafter, "Spinal Ultrasounds"), billed under CPT code 76800.

158. Ultrasound testing is an imaging technique that relies on detection of the reflections or echoes generated as high-frequency sound waves that are passed into the body. Physicians

commonly use this technique for a number of appropriate medical imaging purposes, including prenatal fetal imaging, to evaluate abdominal and pelvic masses, and studies of heart valve function and heart valve motion called echocardiograms.

159. While ultrasound has many legitimate uses in medicine, evaluation of the adult spine in a setting dominated by minor soft tissue injuries is rarely one of them, and only with specific indications. Spinal Ultrasounds are at best experimental and investigational and are not part of the standard of care as promulgated by any major medical organization. They rarely offer additional data that would impact treatment, especially in a setting in which soft tissue injuries prevail, as noted below.

160. Even though Spinal Ultrasounds are rarely performed in legitimate medical practice, particularly when evaluating patients with soft tissue injuries, back pain or radicular symptoms after an automobile accident, Titan continually billed for the performance of Spinal Ultrasounds on Allstate Insureds.

161. The American Institute of Ultrasound in Medicine ("AIUM")'s official statement, which was first approved in 1995 and then consistently reapproved in subsequent years, has stated that Spinal Ultrasounds should not be used in the diagnostic evaluation of the intervertebral discs, facet joints and capsules, and central nerves. It states further that these tests have no proven clinical utility. The AIUM is the largest organization of physicians who perform and interpret ultrasounds.

162. The American College of Radiology is the premier and most authoritative body regarding radiological practices in the world. The American College of Radiology Appropriateness Criteria for "Suspected Spine Trauma" does not even mention the use of diagnostic spinal ultrasounds in the setting of spinal trauma that would occur with an automobile accident.

163. The American Academy of Neurology Report 1998 concluded that "currently, no published peer reviewed literature supports the use of diagnostic ultrasound in the evaluation of patients with back pain or radicular symptoms. The procedure cannot be recommended for use in the clinical evaluation of such patients."

164. The Medical Treatment Guidelines for Mid and Low Back Injury, published by the New York State Workers' Compensation Board on May 2, 2022, does not recommend Spinal Ultrasound for evaluation of back pain.

165. Major medical carriers such as Cigna and Aetna consider diagnostic ultrasounds of the type performed by Titan to be experimental and investigational, as their effectiveness has not been established and is therefore considered medically unnecessary and not covered.

166. Currently, no published randomized controlled trials support the use of Spinal Ultrasound in the evaluation of patients with back pain or radicular symptoms.

167. Underscoring the lack of any clinical utility in Spinal Ultrasounds, there is no CPT code for the procedure in the Fee Schedule. Nevertheless, to induce Allstate to pay for the Spinal Ultrasounds, Titan fraudulently billed under CPT code 76800, as is demonstrated in paragraph 173 below.

168. CPT code 76800 is defined by the Fee Schedule as ultrasonography of the spinal canal and its contents. It includes imaging of the spinal cord, the vertebrae, and the intervertebral discs. It is typically used to help in diagnosis conditions such as spina bifida, tumors, and other anomalies in infants and children under five years old.

169. CPT code 76800 is not meant to include ultrasounds of the paraspinal muscles of the cervical spine, thoracic spine, and lumbar spine. Paraspinal muscles are not part of the Spinal Canal.

170. No legitimate physician, physician assistant, or nurse practitioner would prescribe Spinal Ultrasound in this clinical setting or in the manner allegedly performed by Titan.

### d. The Defendants' Fraudulent Extremity Ultrasound Protocol

171. In addition to Spinal Ultrasounds, Titan also billed Allstate for purportedly performing diagnostic ultrasounds of extremity joints. These were billed under CPT code 76881.

172. In fact, the majority of the bills submitted by Titan were for at least four (4) and up to six (6) Ultrasounds purportedly performed on one date of service.

173. A representative example of Titan's Ultrasound's protocol is below:

<u>Titan Patient SGP (Claim No. 0717318448)</u>

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 06 14 23 | 06 14 23 | 11 | 76881 | TC | A8 | 874 08 | 6 | NPI | 1518565795 |
| 06 14 23 | 06 14 23 | 11 | 76881 | TC | A8 | 194 55 | 1 | NPI | 1518565795 |
| US EXAM ,Cervical Spine Ca | | | | | | | | | |
| 06 14 23 | 06 14 23 | 11 | 76800 | TC | A8 | 177 94 | 1 | NPI | 1518565795 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 06 14 23 | 06 14 23 | 11 | 76881 | TC | A8 | 582 72 | 4 | NPI | 1518565795 |
| 06 14 23 | 06 14 23 | 11 | 76881 | TC | A8 | 194 55 | 1 | NPI | 1518565795 |
| US Exam of Lumbar Spine | | | | | | | | | |
| 06 14 23 | 06 14 23 | 11 | 76800 | TC | A8 | 177 94 | 1 | NPI | 1518565795 |

### ii. The Fraudulent Charges for the Technical Component of Vestibular Testing

174. Through Titan, the Defendants billed Allstate for Vestibular testing. Similar to the Ultrasound, the Vestibular testing that was billed by the Defendants was administered pursuant to a predetermined treatment protocol, which was designed solely for the Defendants' pecuniary gain, with a complete disregard for patient welfare or medical necessity.

175. When used in appropriate circumstances, and performed according to acceptable medical standards, Vestibular testing can aid in diagnosing issues related to a patient's equilibrium, including dizziness, vertigo, and imbalance.

176. One mode of Vestibular testing, videonystagmography ("VNG"), was purportedly provided by the Defendants. VNG is a diagnostic procedure that assesses the vestibular system, with eye movements recorded using infrared cameras, and provides insights into the inner ear and neural pathways. The test involves a series of maneuvers and exercises that stimulate the vestibular system, and then a comparison of a patient's eye movement responses to norms, aiding diagnoses.

177. As discussed above, with most of their claim submissions for Vestibular testing, the Defendants included a "VNG Interpretation" report, which they were unqualified to provide.

178. As reflected in Exhibit 3, Titan repeatedly used the same identical "Chief Complaint" language in virtually all of its VNG Interpretations, stating that every patient complained of recurrent episodes of dizziness and vertigo.

179. The repetition of these same purported complaints for virtually every patient indicates that the Defendants copied and pasted these complaints to justify the VNG testing, rather than documenting individualized patient symptoms.

180. This pattern is highly unlikely in a legitimate medical practice, particularly among a patient population consisting primarily of motor vehicle accident victims with minor soft tissue injuries. Recurrent episodes of dizziness and vertigo are not typical complaints in such a population, and the medical documentation does not support neurological complaints that would prompt VNG testing.

181. Below are representative examples:

*Patient MR (Claim No. 0721783496)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

*Patient VR (Claim No. 0721783496)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

*Patient VR (Claim No. 0721783496)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

*Patient AA (Claim No. 0724142211)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

*Patient MS (Claim No. 0724142211)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

*Patient MA (Claim No. 0725108443)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

*Patient RS (Claim No. 0728701798)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

*Patient GG (Claim No. 0728835959)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

*Patient ZC (Claim No. 0738898996)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

*Patient KAM (Claim No. 0740675897)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

*Patient JY (Claim No. 0741419121)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

*Patient JB (Claim No. 0744357757)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

*Patient JR (Claim No. 0772382339)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

*Patient CC (Claim No. 0774384358)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

*Patient SGS (Claim No. 0776410994)*

**Chief Complaints:** The pt is c/o recurrent episodes of dizziness and vertigo. (All details are in consultation report)

182. Additionally, the statement of recurrent episodes of dizziness and vertigo in the VNG Interpretations were virtually never documented by the patients' contemporary providers in the medical records.

183. The following are representative examples where the patients' other providers' failed to reference their purported symptoms:

(i) On July 10, 2023, Insured VR (Claim No. 0721783496) was purportedly subjected to VNG testing. Titan supported its VNG billing for Insured VR with an undated VNG Interpretation stating that their chief complaint was recurrent episodes of dizziness and vertigo. No reports from VR's other providers state that they complained of these symptoms.

(ii) On September 14, 2023, Insured RS (Claim No. 0728701798) was purportedly subjected to VNG testing. Titan supported its VNG billing for Insured WY with an undated VNG Interpretation stating that their chief complaint was recurrent episodes of dizziness and vertigo. No reports from RS's other providers state that they complained of these symptoms.

(iii) On March 28, 2024, Insured WY (Claim No. 0722118858) was purportedly subjected to VNG testing. Titan supported its VNG billing for Insured WY with an undated VNG Interpretation stating that their chief complaint was recurrent episodes of dizziness and vertigo. No reports from WY's other providers state that they complained of these symptoms.

(iv) On March 28, 2024, Insured JY (Claim No. 0741419121) was purportedly subjected to VNG testing. Titan supported its VNG billing for Insured JY with an undated VNG Interpretation stating that their chief complaint was recurrent episodes of dizziness and vertigo. No reports from JY's other providers state that they complained of these symptoms.

(v) On April 9, 2024, Insured JB (Claim No. 0741419121) was purportedly subjected to VNG testing. Titan supported its VNG billing for Insured JB with an undated VNG Interpretation stating that their chief complaint was recurrent episodes of dizziness and vertigo. No reports from JB's other providers state that they complained of these symptoms.

(vi) On May 23, 2024, Insured KAM (Claim No. 0740675897) was purportedly subjected to VNG testing. Titan supported its VNG billing for Insured KAM with an undated VNG Interpretation stating that their chief complaint was recurrent episodes of dizziness and vertigo. No reports from KAM's other providers state that they complained of these symptoms.

(vii) On March 6, 2025, Insured KJ (Claim No. 0783228489) was purportedly subjected to VNG testing. Titan supported its VNG billing for Insured KJ with an undated VNG Interpretation stating that their chief complaint was recurrent episodes of dizziness and vertigo. No reports from KJ's other providers state that they complained of these symptoms.

(viii) On April 10, 2025, Insured MA (Claim No. 0778317867) was purportedly subjected to VNG testing. Titan supported its VNG billing for Insured MA with an undated VNG Interpretation stating that their chief complaint was recurrent episodes of dizziness and vertigo. No reports from MA's other providers state that they complained of these symptoms.

(ix) On June 23, 2025, Insured EPF (Claim No. 0794572073) was purportedly subjected to VNG testing. Titan supported its VNG billing for Insured EPF with an undated VNG Interpretation stating that their chief complaint was

recurrent episodes of dizziness and vertigo. No reports from EPF's other providers state that they complained of these symptoms.

(x) On September 29, 2025, Insured ECR (Claim No. 0802991133) was purportedly subjected to VNG testing. Titan supported its VNG billing for Insured ECR with an undated VNG Interpretation stating that their chief complaint was recurrent episodes of dizziness and vertigo. No reports from ECR's other providers state that they complained of these symptoms.

184. Moreover, according to the Defendants' VNG Interpretations, as discussed above, virtually all patients had the same exact summaries, impressions, and recommendations, further reenforcing the unnecessary fraudulent nature of the protocol.

185. The VNG Interpretations were also undated, unsigned, and never provided any details about the Insureds' specific conditions or histories. Nor were the results referenced in subsequent medical notes or used to alter the patients' treatment plans, confirming that the testing served no legitimate diagnostic or therapeutic purpose and was instead performed pursuant to the Defendants' predetermined fraudulent protocol.

186. The uniform repetition of identical complaints, Vestibular test results, and recommendations across Titan's claim submissions are inconsistent with individualized clinical evaluation, and support the conclusion that the records were not generated from patient-specific findings.

187. Even if a patient actually reports dizziness and vertigo, in a legitimate medical setting, VNG would not be used as a first-line diagnostic procedure when a patient reports these symptoms as a result of an automobile accident.

188. In an appropriate healthcare setting, the evaluation of a patient reporting these symptoms following a motor vehicle accident would ordinarily begin with a comprehensive clinical assessment, including a detailed history of the accident and symptoms, a physical examination, and, as clinically indicated, otolaryngologic (ENT) and/or neurological evaluations.

189. Virtually none of the Insureds were referred for the purported VNG testing by an ENT specialist or neurologist, and many allegedly received the VNG testing from Titan without having been examined by an ENT specialist or neurologist for these symptoms.

190. Moreover, it is exceedingly unlikely, to the point of being virtually impossible, that multiple Insureds involved in the same motor vehicle accident, despite their varied complaints, medical histories and examination findings, would independently require VNG testing at or about the same time.

191. Nevertheless, and in keeping with the fact that the VNG tests were not medically necessary and were performed pursuant to predetermined protocols to maximize profits, the Defendants purportedly provided VNG testing to multiple Insureds involved in the same accident at or about the same time.

192. For example:

(i) On July 21, 2023, two Insureds, AA and MS, (Claim Number 0724142211) were involved in the same motor vehicle accident. Thereafter, AA and MS both purportedly received VNG testing by Titan on the same exact date, August 11, 2023.

(ii) On November 20, 2024, three Insureds, EA, MA, and BA, (Claim Number 0778317867) were involved in the same motor vehicle accident. Thereafter, EA, MA, and BA all purportedly received VNG testing by Titan on the same exact date, April 10, 2025.

(iii) On March 22, 2025, two Insureds, BW and SW, (Claim Number 0787684991) were involved in the same motor vehicle accident. Thereafter, BW and SW both purportedly received VNG testing by Titan on the same exact date, May 5, 2025.

(iv) On August 27, 2025, two Insureds, DM, and GL, (Claim Number 0804758555) were involved in the same motor vehicle accident. Thereafter, DM and GL both purportedly received VNG testing by Titan on the same exact date, September 23, 2025.

(v) On February 1, 2023, two Insureds, HYC and JSC, (Claim Number 0701887119) were involved in the same motor vehicle accident. Thereafter,

HYC and JSC both purportedly received VNG testing by Titan on the same exact date, June 20, 2023.

(vi) On March 8, 2023, two Insureds, GB and LS, (Claim Number 0707262580) were involved in the same motor vehicle accident. Thereafter, GB and LS both purportedly received VNG testing by Titan on the same exact date, July 10, 2023.

193. In keeping with the fact that the VNG testing was purportedly performed pursuant to a fraudulent protocol designed by laypersons solely for pecuniary benefit, virtually every bill submitted to Allstate for the VNG testing typically resulted in identical charges of $255.42 for each session of VNG that Titan purportedly administered to each Insured.

**iii. The Fraudulent Charges for the Technical Component of Doppler Tests**

194. Through Titan, the Defendants also billed Allstate for Doppler testing pursuant to the same predetermined treatment protocol used for the other Fraudulent Services.

195. The need for this diagnostic testing cannot be inferred simply from an Insured's involvement in a motor vehicle accident. Rather, the nature, mechanism, and severity of any resulting injury depend upon an Insured's individual circumstances.

196. However, the Defendants' protocol ignored these individualized considerations, and subjected Insureds to Doppler testing pursuant to a predetermined protocol designed to maximize billing, without regard to patient welfare or medical necessity.

197. The Doppler testing was purportedly performed on the same dates of service as the VNG testing described above. However, to disguise this fact, Titan submitted two separate bills, one for VNG and one for Doppler, rather than submitting one bill that reflected both services.

A representative example of Titan's VNG and Doppler testing protocol is below:

# VNG:

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
PAGE 2

14. WILL THE PATIENT REQUIRE REHABILITATION AND/OR OCCUPATIONAL THERAPY AS A RESULT OF THE INJURIES SUSTAINED IN THIS ACCIDENT?

YES [✓] NO [ ] IF YES, describe your recommendation below:

15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 08/26/24 | 632 UTICA AVE Brooklyn NY 11203 | SINUSOIDAL ROTATIONAL TEST | 92546 - TC (1 units) | 73.42 |
| 08/26/24 | 632 UTICA AVE Brooklyn NY 11203 | BASIC VESTIBULAR EVALUATION | 92540 - TC (1 units) | 112.30 |
| 08/26/24 | 632 UTICA AVE Brooklyn NY 11203 | CALORIC VESTIBULAR TEST WITH RECORDING, BILATERAL | 92537 - TC (1 units) | 69.70 |
| | | | TOTAL CHARGES TO DATE$ | $ 255.42 |

16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING:

| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO. | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX: EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
|---|---|---|---|---|---|
| PALMIERI, ANTHONY | | 00060480 | | [ ] | Owner |

17. IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary).

Anthony Palmieri, LIC# 00060480

18. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION? YES [✓] NO [ ]

19. ESTIMATED DURATION OF FUTURE TREATMENT

UNDETERMINED

**PATIENT:** Your health provider may agree to accept payment for health services performed directly from your insurer (**Authorization to Pay Benefits**) so that you are not required to make payment to the health provider at the time of service. Such agreement is optional on the part of the health provider and must be signed by both patient and health provider. You may use the optional authorization language provided below, by checking off the designated spot in item 20 of this form.

20. ______ (IF YOU HAVE CHOSEN TO AUTHORIZE THE DIRECT PAYMENT OF BENEFITS BY CHECKING THIS OPTION, YOU MAY NOT ALSO ENTER INTO AN ASSIGNMENT OF BENEFITS CONTAINED IN #21)

**AUTHORIZATION TO PAY BENEFITS:**

I AUTHORIZE PAYMENT OF HEALTH BENEFITS TO THE UNDERSIGNED HEALTH CARE PROVIDER OR SUPPLIER OF SERVICES DESCRIBED BELOW. I RETAIN ALL RIGHTS, PRIVILEGES AND REMEDIES TO WHICH I AM ENTITLED UNDER ARTICLE 51 (THE NO-FAULT PROVISION) OF THE INSURANCE LAW.

PRINT NAME ______________________ PATIENT SIGNED ______________________ PATIENT DATE

CONTINUE ON PAGE 3

NYS FORM NF-3 (Rev 1/2004)
Page 2 of 3

# Doppler:

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
PAGE 2

14. WILL THE PATIENT REQUIRE REHABILITATION AND/OR OCCUPATIONAL THERAPY AS A RESULT OF THE INJURIES SUSTAINED IN THIS ACCIDENT?
YES [✓] NO [ ] IF YES, describe your recommendation below:

15. REPORT OF SERVICES RENDERED – ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 08/26/24 | 632 UTICA AVE Brooklyn NY 11203 | TRANSCRANIAL DOPPLER STUDY OF INTRACRANIAL ARTERIES | 93890 - TC (1 units) | 412.80 |
| 08/26/24 | 632 UTICA AVE Brooklyn NY 11203 | INTRACRANIAL STUDY | 93886 - TC (1 units) | 304.40 |
| 08/26/24 | 632 UTICA AVE Brooklyn NY 11203 | [illegible] | 93892 - TC (1 units) | 438.03 |
| | | | TOTAL CHARGES TO DATE | $ 1155.23 |

16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING:

| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO. | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX: EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
|---|---|---|---|---|---|
| PALMIERI, ANTHONY | | 00060480 | | [ ] | Owner |

17. IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary).

Anthony Palmieri, LIC# 00060480

18. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION? YES [✓] NO [ ]

19. ESTIMATED DURATION OF FUTURE TREATMENT

UNDETERMINED

**PATIENT:** Your health provider may agree to accept payment for health services performed directly from your insurer (**Authorization to Pay Benefits**) so that you are not required to make payment to the health provider at the time of service. Such agreement is optional on the part of the health provider and must be signed by both patient and health provider. You may use the optional authorization language provided below, by checking off the designated spot in item 20 of this form.

20. _____ **(IF YOU HAVE CHOSEN TO AUTHORIZE THE DIRECT PAYMENT OF BENEFITS BY CHECKING THIS OPTION, YOU MAY NOT ALSO ENTER INTO AN ASSIGNMENT OF BENEFITS CONTAINED IN #21)**

**AUTHORIZATION TO PAY BENEFITS:**

I AUTHORIZE PAYMENT OF HEALTH BENEFITS TO THE UNDERSIGNED HEALTH CARE PROVIDER OR SUPPLIER OF SERVICES DESCRIBED BELOW. I RETAIN ALL RIGHTS, PRIVILEGES AND REMEDIES TO WHICH I AM ENTITLED UNDER ARTICLE 51 (THE NO-FAULT PROVISION) OF THE INSURANCE LAW.

PRINT NAME ______________________ SIGNED ______________________
PATIENT PATIENT DATE

198. One type of Doppler testing, Transcranial Doppler ("TCD"), was purportedly performed by the Defendants. TCD is a non-invasive technique by which specialized equipment is used to target then measure sound waves to detect and diagnose blood flow problems in the brain. When utilized appropriately in a legitimate medical practice, TCD is a diagnostic test to evaluate potentially life-threatening conditions. It has no place in a clinical setting in which the

patients present with complaints consistent with minor soft tissue injuries, except in the rarest of circumstances.

199. The selection of diagnostic studies to perform, such as TCD, should reflect the patient's individual signs, symptoms, and clinical circumstances, rather than adherence to a predetermined testing regimen. They should be ordered based on medical necessity and the patient's specific clinical presentation, rather than solely because a test is part of a routine or predetermined protocol.

200. However, the Defendants' charges for the technical component of the TCD were fraudulent in that the TCD was medically unnecessary and was performed, to the extent that it was performed at all, pursuant to the payments that were provided to the Clinics.

201. As discussed above, in most of the Defendants' claims for TCD, there was no prescription or referral submitted for the purported testing.

202. This type of practice is virtually unheard of in a legitimate clinical setting, where any diagnostic testing deemed necessary would ordinarily be performed pursuant to a written or electronic order issued by a physician or other licensed healthcare provider, based upon a documented clinical assessment and relevant patient history.

203. Additionally, there is no direct or uniform relationship between involvement in a motor vehicle collision with injuries and the diagnostic testing that was allegedly performed by Titan. The existence, cause, and extent of any injury depend upon numerous variables, including a patient's age, height, weight, physical condition, position in the vehicle, and the location and forces associated with the collision.

204. Nevertheless, and in keeping with the fact that the TCD was not medically necessary and was performed pursuant to predetermined protocols to maximize profits, the Defendants

purportedly provided TCD to multiple Insureds involved in the same accident at or about the same time.

205. For example:

(i) On July 21, 2023, two Insureds, AA and MS, (Claim Number 0724142211) were involved in the same motor vehicle accident. Thereafter, AA and MS both purportedly received TCD testing by Titan on the same exact date, August 11, 2023.

(ii) On November 20, 2024, three Insureds, EA, MA, and BA, (Claim Number 0778317867) were involved in the same motor vehicle accident. Thereafter, EA, MA, and BA all purportedly received TCD testing by Titan on the same exact date, April 10, 2025.

(iii) On March 22, 2025, two Insureds, BW and SW, (Claim Number 0787684991) were involved in the same motor vehicle accident. Thereafter, BW and SW both purportedly received TCD testing by Titan on the same exact date, May 5, 2025.

(iv) On August 27, 2025, two Insureds, DM, and GL, (Claim Number 0804758555) were involved in the same motor vehicle accident. Thereafter, DM and GL both purportedly received TCD testing by Titan on the same exact date, September 23, 2025.

(v) On February 1, 2023, two Insureds, HYC and JSC, (Claim Number 0701887119) were involved in the same motor vehicle accident. Thereafter, HYC and JSC both purportedly received TCD testing by Titan on the same exact date, June 20, 2023.

206. For most of its claims for TCD, Titan's reports provide a "TCD Conclusion," which purported to set forth the results of the TCD testing.

207. Although Titan's bills represented that it was billing for the technical component of TCD, the submission of a "TCD Conclusion" demonstrates that Titan instead purported to interpret the alleged test results.

208. As with its Ultrasound and VNG testing, Titan, an unlicensed and non-professional entity, lacked the legal authority, licensure, and qualifications to render such medical interpretations.

209. Moreover, Titan's "TCD Conclusion" was identical across virtually all of its patients. Below are representative examples:

*Patient MR (Claim No. 0721783496)*

**TCD Conclusion:**
Normal study with adequate functional reserve testing (VMR).No evidence of high intensity transient signals (micro-emboli).
This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease.
TCD is not sensitive for tumors, aneurysms, and small AVM's.The testing was performed by a technician and the reading is based solely on the tracing provided

**Signature:**
**Report Date:** 10/09/2023

*Patient VR (Claim No. 0721783496)*

**TCD Conclusion:**
Normal study with adequate functional reserve testing (VMR).No evidence of high intensity transient signals (micro-emboli).
This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease.
TCD is not sensitive for tumors, aneurysms, and small AVM's.The testing was performed by a technician and the reading is based solely on the tracing provided

**Signature:**
**Report Date:** 07/10/2023

*Patient AA (Claim No. 0724142211)*

**TCD Conclusion:**
Normal study with adequate functional reserve testing (VMR).No evidence of high intensity transient signals (micro-emboli).
This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease.
TCD is not sensitive for tumors, aneurysms, and small AVM's.The testing was performed by a technician and the reading is based solely on the tracing provided

**Signature:**
**Report Date:** 08/11/2023

*Patient MS (Claim No. 0724142211)*

**TCD Conclusion:**
Normal study with adequate functional reserve testing (VMR).No evidence of high intensity transient signals (micro-emboli).
This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease.
TCD is not sensitive for tumors, aneurysms, and small AVM's.The testing was performed by a technician and the reading is based solely on the tracing provided

**Signature:**
**Report Date:** 08/11/2023

*Patient MA (Claim No. 0725108443)*

**TCD Conclusion:**
Normal study with adequate functional reserve testing (VMR).No evidence of high intensity transient signals (micro-emboli).
This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease.
TCD is not sensitive for tumors, aneurysms, and small AVM's.The testing was performed by a technician and the reading is based solely on the tracing provided

**Signature:**
**Report Date:** 09/11/2023

*Patient JV (Claim No. 0762374080)*

**TCD Conclusion:**
Normal study with adequate functional reserve testing (VMR).No evidence of high intensity transient signals (micro-emboli).
This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease.
TCD is not sensitive for tumors, aneurysms, and small AVM's.The testing was performed by a technician and the reading is based solely on the tracing provided

. **Signature:**
**Report Date:** 08/26/2024

*Patient JR (Claim No. 0772382339)*

**TCD Conclusion:**
Normal study with adequate functional reserve testing (VMR).No evidence of high intensity transient signals (micro-emboli).
This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease.
TCD is not sensitive for tumors, aneurysms, and small AVM's.The testing was performed by a technician and the reading is based solely on the tracing provided

**Signature:**
**Report Date:** 01/31/2025

*Patient AS (Claim No. 0778202234)*

**TCD Conclusion:**
Normal study with adequate functional reserve testing (VMR).No evidence of high intensity transient signals (micro-emboli).
This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease.
TCD is not sensitive for tumors, aneurysms, and small AVM's.The testing was performed by a technician and the reading is based solely on the tracing provided

**Signature:**
**Report Date:** 05/30/2025

*Patient EA (Claim No. 0721783496)*

**TCD Conclusion:**
Normal study with adequate functional reserve testing (VMR).No evidence of high intensity transient signals (micro-emboli).
This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease.
TCD is not sensitive for tumors, aneurysms, and small AVM's.The testing was performed by a technician and the reading is based solely on the tracing provided

**Signature:**
**Report Date:** 04/10/2025

*Patient MA (Claim No. 0721783496)*

**TCD Conclusion:**
Normal study with adequate functional reserve testing (VMR).No evidence of high intensity transient signals (micro-emboli).
This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease.
TCD is not sensitive for tumors, aneurysms, and small AVM's.The testing was performed by a technician and the reading is based solely on the tracing provided

**Signature:**
**Report Date:** 04/10/2025

*Patient SGS (Claim No. 0776410994)*

**TCD Conclusion:**
Normal study with adequate functional reserve testing (VMR).No evidence of high intensity transient signals (micro-emboli).
This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease.
TCD is not sensitive for tumors, aneurysms, and small AVM's.The testing was performed by a technician and the reading is based solely on the tracing provided

**Signature:**
**Report Date:** 01/31/2025

*Patient KJ (Claim No. 0783228489)*

**TCD Conclusion:**
Normal study with adequate functional reserve testing (VMR).No evidence of high intensity transient signals (micro-emboli).
This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease.
TCD is not sensitive for tumors, aneurysms, and small AVM's.The testing was performed by a technician and the reading is based solely on the tracing provided

**Signature:**
**Report Date:** 03/06/2025

*Patient KSD (Claim No. 0784196866)*

**TCD Conclusion:**
Normal study with adequate functional reserve testing (VMR).No evidence of high intensity transient signals (micro-emboli).
This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease.
TCD is not sensitive for tumors, aneurysms, and small AVM's.The testing was performed by a technician and the reading is based solely on the tracing provided

**Signature:**
**Report Date:** 04/10/2025

*Patient SW(Claim No. 0787684991)*

**TCD Conclusion:**
Normal study with adequate functional reserve testing (VMR).No evidence of high intensity transient signals (micro-emboli).
This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease.
TCD is not sensitive for tumors, aneurysms, and small AVM's.The testing was performed by a technician and the reading is based solely on the tracing provided

**Signature:**
**Report Date:** 05/05/2025

210. As shown above, in all of Titan's TCD Conclusions, the patients' TCD tests resulted in normal studies, although in a legitimate medical setting, in which diagnostic testing is performed to confirm a suspected diagnosis, a certain percentage of test results would be expected to be positive.

211. It defies common sense and medical reality to suggest that virtually every Insured, despite widely varying injuries, symptoms, and clinical presentations, would purportedly generate

identical and normal TCD conclusions, strongly suggesting that the testing was not individualized and lacked genuine diagnostic value.

212. As discussed above, the New York State Education Law defines the practice of medicine as diagnosing, treating, operating, or prescribing for any human disease, pain, injury, deformity, or physical condition. By interpreting the TCD test results, and providing conclusions regarding same, Titan and Palmieri were engaged in the unlawful practice of medicine under New York law.

## III. The Fraudulent Charges the Defendants Submitted to Allstate

213. To support their fraudulent charges, the Defendants systematically submitted, or caused to be submitted, to Allstate, through US Post, documentation that consisted of NF-3 Claim Forms, HCFA-1500 Claim Forms, medical records, Assignments of Benefits, referrals, correspondences, and other supporting documentation (hereinafter, the "Claims Submissions"), which were materially false and/or misleading, to obtain payment for services they were never entitled to receive.

214. The Claims Submissions submitted to Allstate by and on behalf of Titan were false and misleading in the following material respects:

(i) The Claims Submissions submitted by or on behalf of Titan uniformly misrepresented to Allstate that the healthcare services were legitimately performed by medical professionals, when in reality, the Defendants engaged in the unlicensed practice of medicine by performing, directing, and billing for healthcare services, in the absence of virtually any legitimate medical referrals;

(ii) The Claims Submissions submitted by or on behalf of Titan uniformly misrepresented to Allstate that the Ultrasound and Doppler testing were lawfully rendered by licensed radiologic technologists. In reality, the Defendants engaged in the unlawful practice of radiologic technology by performing, directing, and billing for Ultrasound and Doppler, despite not being licensed in New York as radiologic technologists and also not being physicians, dentists, podiatrists, or chiropractors;

(iii) The Claims Submissions submitted by or on behalf of Titan uniformly misrepresented to Allstate that Titan had the legal and regulatory authority to bill for professional medical services and receive No-Fault reimbursement. In reality, Titan lacked the required legal and regulatory authority to bill for professional medical services and receive No-Fault reimbursement because it was not a medical Professional Corporation and was not registered with the New York State Education Department, Office of the Professions;

(iv) The Claims Submissions submitted by or on behalf of Titan uniformly misrepresented to Allstate that services were medically necessary. In reality, the Defendants intentionally and knowingly schemed to, and did, subject Insureds to medically unnecessary and unproven service(s) designed for no other purpose than to defraud Allstate and other insurers; and

(v) The Claims Submissions submitted by or on behalf of Titan uniformly misrepresented and exaggerated the level and types of services purportedly provided, using billing codes that would inflate the charges submitted to Allstate.

## IV. <u>The Defendants' Fraudulent Concealment and Allstate's Justifiable Reliance</u>

215. The Defendants were obligated to act honestly and with integrity in connection with the billing they submitted, or caused to be submitted, to Allstate.

216. The Defendants participated in a complex and systematic plan under which they knowingly misrepresented and concealed facts related to the Fraudulent Scheme in order to evade detection and induce Allstate to make payments to Titan which Allstate was never required to make, and Defendants were never entitled to receive.

217. Additionally, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that Titan was performing professional health services without a license, and without legitimate referrals from licensed practitioners.

218. The Defendants knowingly misrepresented and concealed facts related to who was performing the Fraudulent Services, to the extent they were performed all.

219. The Defendants knowingly misrepresented and concealed facts related to the lack of medical necessity, and that the services were rendered pursuant to predetermined treatment protocols not based on the conditions of the Insureds.

220. The Defendants further knowingly misrepresented and concealed that the CPT codes did not reflect the services actually rendered, to the extent any services were rendered at all.

221. Pursuant to the No-Fault laws, Allstate has a contractual obligation to verify and/or process claims in a prompt and fair manner, within thirty days. Defendants' conduct described herein was done intentionally and purposefully to evade detection and induce Allstate to make payments for the Fraudulent Services. When making payments to Titan, Allstate justifiably relied on the documents submitted because Defendants went through great lengths to ensure that the Claims Submissions appeared facially valid.

222. As a result of the extensive measures undertaken by Defendants to misrepresent and conceal their fraudulent conduct, Allstate did not discover, and through the exercise of reasonable diligence, could not have discovered that its damages were caused by Defendants' intentional actions until shortly before the filing of this Complaint.

223. As a result of the Defendants' unlawful conduct, which violated New York and federal laws, Allstate was injured in their business and property, in the amount of $179,689.87.

## AS AND FOR A FIRST CAUSE OF ACTION

**Against Palmieri and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**
**TITAN ENTERPRISE**

224. Allstate re-alleges, re-pleads, and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

225. Titan is an ongoing enterprise as defined by 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

226. At all times relevant to this Complaint, Palmieri and the John Doe Defendants were "persons" employed by and/or associated with Titan within the meaning of 18 U.S.C § 1961(3).

227. Palmieri and the John Doe Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of the affairs of Titan through a pattern of racketeering activity as defined in 18 U.S.C. § 1962(c) consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, by submitting, or causing to be submitted, through the U.S. Mail, hundreds of fraudulent claims to Allstate seeking payments for services on behalf of Titan knowing that they were not reimbursable under the No- Fault laws. The scheme included:

(i) The Defendants engaged in the unlicensed practice of medicine by performing, directing, and billing for healthcare services, despite the absence of virtually any legitimate medical referrals;

(ii) The Defendants engaged in the unlawful practice of radiologic technology by performing, directing, and billing for Ultrasounds and Doppler, despite not being licensed in New York as radiologic technologists and also not being physicians, dentists, podiatrists, or chiropractors;

(iii) At all relevant times, Titan lacked the required legal and regulatory authority to bill for professional medical services and receive No-Fault reimbursement because it was not a medical Professional Corporation and was not registered with the New York State Education Department, Office of the Professions; and

(iv) The Defendants misrepresented and exaggerated the level and types of services purportedly provided, using billing codes that would inflate the charges submitted to Allstate.

228. Palmieri and the John Doe Defendants participated in the scheme which began in May 2023 and remains ongoing. The pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future as the Defendants continue to submit fraudulent billing and continue to attempt collection on the fraudulent billing.

229. A representative sample of the fraudulent charges submitted to Allstate that comprise, in part, the pattern of racketeering activities identified through the date of this Complaint

are described, in part, in the chart annexed as Exhibit 1. All of the fraudulent charges identified in Exhibit 1 were submitted to Allstate through the U.S. mail.

230. Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $179,689.87 pursuant to the fraudulent bills submitted by the Defendants through Titan.

231. By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), equitable relief pursuant to 18 U.S.C. § 1964(a). to prevent and restrain any further collection on the fraudulent billing, and any other relief the Court deems just and proper.

**AS AND FOR A SECOND CAUSE OF ACTION**

**Against Palmieri and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**
**TITAN ENTERPRISE**

232. Allstate re-alleges, re-pleads, and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

233. Titan is an ongoing enterprise, as defined by 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

234. At all times relevant to this Complaint, Palmieri and the John Doe Defendants were "persons" employed by and/or associated with Titan within the meaning of 18 U.S.C § 1961(3).

235. Palmieri and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of the affairs of the Titan Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1962(c) consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, by submitting, or causing to be submitted, through the U.S. mail, hundreds of fraudulent claims to Allstate seeking

payments for services on behalf of Titan knowing that they were not reimbursable under the No-Fault law. The scheme included:

(i) The Defendants engaged in the unlicensed practice of medicine by performing, directing, and billing for healthcare services, despite the absence of virtually any legitimate medical referrals;

(ii) The Defendants engaged in the unlawful practice of radiologic technology by performing, directing, and billing for Ultrasounds and Doppler, despite not being licensed in New York as radiologic technologists and also not being physicians, dentists, podiatrists, or chiropractors;

(iii) At all relevant times, Titan lacked the required legal and regulatory authority to bill for professional medical services and receive No-Fault reimbursement because it was not a medical Professional Corporation and was not registered with the New York State Education Department, Office of the Professions;

(iv) The Defendants intentionally and knowingly schemed to, and did, subject Insureds to medically unnecessary and unproven service(s) designed for no other purpose than to defraud Allstate and other insurers; and

(v) The Defendants misrepresented and exaggerated the level and types of services purportedly provided, using billing codes that would inflate the charges submitted to Allstate.

236. A representative sample of the fraudulent charges submitted to Allstate that comprise, in part, the pattern of racketeering activities identified through the date of this Complaint are described, in part, in the chart annexed as Exhibit 1.

237. Palmieri and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of fraudulent charges to Allstate.

238. Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $179,689.87 pursuant to the fraudulent bills submitted by the Defendants through Titan.

239. By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), equitable relief pursuant to 18 U.S.C. § 1964(a) to prevent and restrain any further collection on the fraudulent billing, and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**

**Against All Defendants**
**(Common Law Fraud)**

240. Allstate re-alleges, re-pleads, and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

241. As described herein, Palmieri, Titan, and the John Doe Defendants schemed to defraud and defrauded Allstate by intentionally and knowingly making material misrepresentations of fact and concealing material facts from Allstate in the submissions of hundreds of fraudulent claims on behalf of Titan in which they seek payment for the Fraudulent Services.

242. The fraudulent and material misrepresentations of fact and acts of concealment started no later than May 2023. The Claims Submissions submitted to Allstate by and on behalf of Titan were false and misleading in the following material respects:

(i) The Claims Submissions submitted by or on behalf of Titan uniformly misrepresented to Allstate that the healthcare services were legitimately performed by medical professionals, when in reality, the Defendants engaged in the unlicensed practice of medicine by performing, directing, and billing for healthcare services, in the absence of virtually any legitimate medical referrals;

(ii) The Claims Submissions submitted by or on behalf of Titan uniformly misrepresented to Allstate that the Ultrasound and Doppler testing were lawfully rendered by licensed radiologic technologists. In reality, the Defendants engaged in the unlawful practice of radiologic technology by performing, directing, and billing for Ultrasound and Doppler, despite not being licensed in New York as radiologic technologists and also not being physicians, dentists, podiatrists, or chiropractors;

(iii) The Claims Submissions submitted by or on behalf of Titan uniformly misrepresented to Allstate that Titan had the legal and regulatory authority to bill for professional medical services and receive No-Fault reimbursement. In reality, Titan lacked the required legal and regulatory authority to bill for professional medical services and receive No-Fault reimbursement because it was not a medical Professional Corporation and was not registered with the New York State Education Department, Office of the Professions;

(iv) The Claims Submissions submitted by or on behalf of Titan uniformly misrepresented to Allstate that services were medically necessary. In reality, the Defendants intentionally and knowingly schemed to, and did, subject Insureds to medically unnecessary and unproven service(s) designed for no other purpose than to defraud Allstate and other insurers; and

(v) The Claims Submissions submitted by or on behalf of Titan uniformly misrepresented and exaggerated the level and types of services purportedly provided, using billing codes that would inflate the charges submitted to Allstate.

243. Palmieri, Titan, and the John Doe Defendants intentionally and knowingly made the above-referenced material misrepresentations and concealed material facts in a contrived, calculated effort to give the services a false appearance of validity when they knew the services were not reimbursable under the No-Fault laws. Palmieri, Titan, and the John Doe Defendants' conduct induced Allstate to pay charges submitted by, or on behalf of Titan that it was never entitled to receive.

244. Allstate did in fact reasonably and justifiably rely, to its detriment, upon the facially valid claims submissions by Titan. As a proximate result of the false and fraudulent claim submissions by Titan, Allstate has been injured in its business and property, in that it has paid at least $179,689.87.

245. Allstate would not have issued payment, or have been obligated to issue payment, to Titan for the Fraudulent Services but for the concealment and intentional and material misrepresentations made by Palmieri, Titan, and the John Doe Defendants.

246. Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION

**Against All Defendants**
**(Unjust Enrichment)**

247. Allstate re-alleges, re-pleads, and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

248. As set forth above, Palmieri, Titan, and the John Doe Defendants have engaged in unjust, improper, and/or unlawful acts, all to the detriment and harm of Allstate.

249. When Allstate reimbursed Titan, by paying the bills and charges submitted by or on behalf of Titan, it reasonably believed that it was legally obligated to make such payments based on the unjust, improper, and/or unlawful acts of Palmieri, Titan, and the John Doe Defendants.

250. Palmieri, Titan, and the John Doe Defendants' retention of Allstate's payments violates the fundamental principles of justice, equity, and good conscience.

251. By reason of the acts described above, Palmieri, Titan, and the John Doe Defendants have been unjustly enriched in the amount to be determined at trial, but at a minimum, the sum of $179,689.87.

## AS AND FOR A FIFTH CAUSE OF ACTION

**Against Titan**
**(Declaratory Judgment - 28 U.S.C. §§ 2201 and 2202)**

252. Allstate re-alleges, re-pleads, and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

253. To be eligible to receive assigned No-Fault Benefits, an assignee provider must adhere to all applicable New York laws that grant them the authority to provide health care services

in New York. Healthcare professionals are not eligible to bill or to collect No-Fault Benefits, if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

254. Titan was never eligible to receive No-Fault Benefits and has no right to receive payment from Allstate on the unpaid billing because:

(i) The Defendants engaged in the unlicensed practice of medicine by performing, directing, and billing for healthcare services, despite the absence of virtually any legitimate medical referrals;

(ii) The Defendants engaged in the unlawful practice of radiologic technology by performing, directing, and billing for Ultrasounds and Doppler, despite not being licensed in New York as radiologic technologists and also not being physicians, dentists, podiatrists, or chiropractors;

(iii) At all relevant times, Titan lacked the required legal and regulatory authority to bill for professional medical services and receive No-Fault reimbursement because it was not a medical Professional Corporation and was not registered with the New York State Education Department, Office of the Professions;

(iv) The Defendants intentionally and knowingly schemed to, and did, subject Insureds to medically unnecessary and unproven service(s) designed for no other purpose than to defraud Allstate and other insurers; and

(v) The Defendants misrepresented and exaggerated the level and types of services purportedly provided, using billing codes that would inflate the charges submitted to Allstate.

255. There is an actual and justiciable case and controversy between Allstate and Titan in the total amount of $1,124,278.86, of unpaid billing for the Fraudulent Services that were submitted to Allstate by the Defendants.

256. Titan continues to bill Allstate for fraudulent services and challenge Allstate’s prior denials of its claims.

257. Titan continues to commence litigation in New York Civil Courts, as well as continue to file arbitrations with the American Arbitration Association, against Allstate, seeking payment for No-Fault Benefits allegedly due and owing.

258. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Titan has no right to receive payment for any pending bills and charges submitted to Allstate.

## DEMAND FOR RELIEF

259. Pursuant to Federal Rule of Civil Procedure 38(b), Allstate demands a trial by jury.

WHEREFORE, Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company and Allstate Fire and Casualty Insurance Company (collectively, "Allstate"), respectfully ask that a Judgement be entered in their favor and against the Defendants, as follows:

A. On the First Cause of Action against Palmieri and the John Doe Defendants:

(i) AWARD compensatory damages in favor of Allstate in an amount to be determined at trial, but in excess of $179,689.87, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and grant equitable relief pursuant to 18 U.S.C. § 1964(a) to prevent and restrain any further collection on the fraudulent billing; and

(ii) GRANT all other relief this Court deems just.

B. On the Second Cause of Action against Palmieri and the John Doe Defendants:

(i) AWARD compensatory damages in favor of Allstate in an amount to be determined at trial, but in excess of $179,689.87, together with costs and interest, and grant equitable relief pursuant to 18 U.S.C. § 1964(a) to prevent and restrain any further collection on the fraudulent billing; and

(ii) GRANT all other relief this Court deems just.

C. On the Third Cause of Action against Palmieri, Titan, and the John Doe Defendants:

(i) AWARD compensatory damages in favor of Allstate in an amount to be determined at trial, but in excess of $179,689.87, together with punitive damages, costs, and interest; and

(ii) GRANT all other relief this Court deems just.

D. On the Fourth Cause of Action against Palmieri, Titan, and the John Doe Defendants:

(i) AWARD compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $179,689.87, together with costs and interest; and

(ii) GRANT all other relief this Court deems just.

E. On the Fifth Cause of Action against Titan:

(i) DECLARE, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Palmieri, through Titan, unlawfully practiced medicine by performing, directing, and billing for healthcare services, despite the absence of virtually any legitimate medical referrals;

(ii) DECLARE, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Palmieri, through Titan, unlawfully practiced radiologic technology by performing, directing, and billing for Ultrasound and Doppler, despite not being licensed in New York as a radiologic technologist and also not being a physician, dentist, podiatrist, or chiropractor;

(iii) DECLARE, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Titan was never eligible to bill for medical services nor entitled to No-Fault reimbursement because it was not a medical Professional Corporation and was not registered with the New York State Education Department, Office of the Professions;

(iv) DECLARE that Allstate has no obligation to pay any pending, previously denied and/or future No-Fault insurance claims submitted by Titan; and

(v) GRANT all other relief this Court deems just.

**[SIGNATURE PAGE TO FOLLOW]**

Dated: October 7, 2026

Uniondale, New York

Law Offices of Camille Nanni

*/s/ Ellen Burach-Zion*

Ellen Burach-Zion, Esq.
Komal Keluskar, Esq.
1125 RXR Plaza, East Tower 11th Floor
Uniondale, New York 11556
914-486-8122

Counsel for Plaintiffs,

*Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Indemnity Company*

# INDEX OF EXHIBITS

**EXHIBIT 1:** **REPRESENTATIVE SAMPLE OF FRAUDULENT BILLS MAILED TO ALLSTATE**

**EXHIBIT 2:** **REPRESENTATIVE EXAMPLES OF LETTERS OF MEDICAL NECESSITY**

**EXHIBIT 3:** **REPRESENTATIVE EXAMPLES OF VNG INTERPRETATIONS**

**EXHIBIT 4:** **CIVIL RACKETEERING INVOLVING SERVICE LOCATIONS**